## CLAPP *v.* THE COUNTY OF CEDAR.

Where a demand against a county is liquidated, an original suit on such demand may be brought against the county in the District Court.

The statute only requires that unliquidated demands for money against the county, shall first be presented to the proper auditing officer. Where a claim has been presented and allowed, and the county warrant, bond, or note issued therefor, there can be no object in again presenting it to the County Judge.

The authority of counties to subscribe to stock in railway companies, whose road is to run through such counties, whatever might be the opinion of the Court, were it *res nova*, is not now an open question in the State of Iowa. After one or two judicial decisions by the highest Court in the State, affirming the power, and repeated legislative recognitions of the right, the counties must be held to possess the right and authority. [WRIGHT, C. J., dissenting.]

Section 114 of the Code, does not authorize counties to subscribe to stock in railway companies.

Section 119 of the Code, does not require the County Judge to give *thirty* days notice of the adoption by a vote of the people, of a proposition for subscribing to the capital stock of a railroad company.

Where a cause of demurrer is too general, it may be disregarded by the Court.

The recitals in a bond executed by a County Judge, are not conclusive upon the county.

Whether interest coupons attached to a bond issued by a county, in payment of subscription to the capital stock of a railroad company, have an existence independent of the bond, and could be sued upon separately, *quare?*

Bonds issued by a county, in payment of subscription of stock in a railroad company, are negotiable instruments.

Although bonds issued by a county, in payment of stock in a railroad

Clapp v. The County of Cedar.

company, are negotiable instruments, yet they are obligations executed by a public officer in the name of the county, and if issued without authority of law, are not binding upon the county.

The purchaser of a county bond, issued in payment of stock in a railroad company, is not bound to look behind the county records and ascertain their *truth*, but may rely upon the records for the facts stated in relation to the vote of a county authorizing such subscription of stock.

The purchaser is only bound to know that there is a law authorizing the issuing of such bonds.

Where the county records show enough upon the matter of authority to issue the bonds, to justify the purchaser in taking the bond, he cannot be required to go behind it, and show that the record is true.

Where it appeared from the county records, that a proposition to subscribe to the capital stock of a railroad company, was ordered to be submitted to a vote of the people of the county—what the proposition was—and the time when the vote was to be taken; that a majority of the votes were in favor of adopting the proposition; and that an order was made, declaring the result, and to carry it into effect: *Held*, 1. That the records showed sufficient authority for the issuing of the bonds in payment of the subscription to the stock of said railroad company; 2. That the purchaser of such a bond may presume from the record, that the notice required by Section 115 of the Code, was duly published.

Where a proposition to subscribe to the capital stock of a railroad company, which was submitted to and adopted by a vote of the people of the county, provided that the money so voted, "should be expended only in the event of the said railroad being 'constructed and running centrally through the said county;" and where, in a suit on interest coupons attached to one of the county bonds, issued in pursuance of said vote, in payment of said subscription to said railroad company, it was contended that the final construction of the road through the county was a condition precedent to the issuing of the bonds; *Held*, 1. That the clause was ambiguous, and admitted of a doubt, whether the word "constructed" did not belong to the word "centrally," as the word "running" did, making it mean, "constructed, and running centrally;" 2. That the County Judge, by his act in issuing the bonds, had placed a construction upon the ambiguity; 3. That the purchaser of the bond had a right to act upon the construction adopted by the legal agent of the county; 4. That when the bonds were issued, a purchaser was warranted in presuming that the road had been built to the acceptance of the county.

The fact that a county has subscribed to the capital stock of a railroad company, cannot appear from the county records.

The purchaser of county bonds, issued in payment of subscription by the county to the capital stock of a railroad corporation, may and

Clapp v. The County of Cedar.

must presume certain things, from the fact that the bonds' are issued.

The County Judge is an agent only *sub modo*; and the doctrines of principal and agent do not, in general, apply to him.

Although the powers of the County Judge are limited by the law, yet he is a public officer, keeping a record; and as against that officer and the county, strangers have a right to take that record as true in its statements, and in its necessary implications and presumptions; and the officer is answerable to the law for his wrong and erroneous acts, if he has carried them into the record.

Where in an action by an indorsee against a county, on interest coupons attached to a bond of $1,000, payable in twenty years after date, issued to the Lyons Iowa Central railroad company, in payment of subscription to the capital stock of said company, the defendant, among other things, pleaded the following: "That the said Lyons company never had possession of the bond, nor was it ever delivered to said company; but that Henry P. Adams, Wm. G. Haun, James McCoy, and others not known to the defendant, pretending to represent the company, colluded and conspired together, and by fraud, misrepresentation and deceit, unlawfully got possession of the bond, and afterwards fraudulently, and without authority of law, or of said company, pretended to assign the same to the said Henry P. Adams, who, in the whole transaction, was the leading spirit, and the wholesale swindler:" *Held*, 1. That the answer should have set out more specifically the fraud and misrepresentation relied on; 2. That the plea was not available as a defence against an indorsee, without notice.

Where suit is brought by an indorsee upon a negotiable instrument, a defence which goes to the original inducement and motive for the execution of the instrument, is not available against the holder, unless he is alleged and proved to have received the instrument with notice of the subject matter of defence.

If a county is induced to subscribe to the capital stock of a railway corporation, in payment for which it issues negotiable bonds, by fraud and misrepresentation, and it is sought to set up such a defence against an assignee of the bonds, it must be alleged and proved that such assignee is not a *bona fide* holder.

In an action on a negotiable instrument, in the name of an assignee, a plea which alleges that the assignee is not a *bona fide* holder, but not showing why or how, is insufficient.

In an action on a negotiable instrument, in the name of an assignee, a plea which alleges that the instrument was obtained by fraud and misrepresentation, but which does not charge the assignee with notice, nor show that he is not a *bona fide* holder, nor that he received the instrument after due, will not, if sustained by proof as to the fraud and misrepresentation, throw upon the assignee the burthen of

showing that he obtained the instrument *bona fide*, or gave value for it.

The purchaser of a county bond, issued in payment of subscription to the capital stock of a railroad corporation, has nothing to do with the fact that the company, since the issuing of the bond, has become insolvent, or may have been dissolved.

*Appeal from the Johnson District Court.*

SATURDAY, JUNE 20.

The County Judge of Cedar county, on the 1st of June, 1853, issued twenty bonds, for the payment of one thousand dollars each, of one of which the following is a copy:

"UNITED STATES OF AMERICA.

"STATE OF IOWA.      $1000.

"No. 4.      COUNTY OF CEDAR.  .

"Six per cent. loan, for subscription to the capital stock of the Lyons Iowa Central railroad company.

"Be it known, that the county of Cedar, in the State of Iowa, owes to the Lyons Iowa Central railroad company, one thousand dollars, which *sum* the Judge of the County Court of said county, having been duly authorized by a majority of the qualified voters of said county therefor, promises in behalf of said county, to pay to the said Lyons Iowa Central railroad company, or its assigns, at the Bank of the Commonwealth, in the city of New York, on the first day of June, A. D. 1873, and to pay interest thereon at the rate of six per centum per annum, on the first day of each December and each June ensuing the date hereof, at the said Bank of the Commonwealth, in the city of New York, upon the surrender of the annexed interest warrants, signed, by order of the said Judge of said County Court of said county, by J. W. Cattell, Clerk of said county. And the said Judge of said County Court, also agrees, in behalf of said county, to transfer, to the holder of this obligation, at any time, before the maturity of the same, if said holder shall elect

to receive them, ten shares of one hundred dollars each, of the capital stock of the said Lyons Iowa Central railroad company, in exchange for, and in satisfaction of this obligation, upon the surrender of the same, and the unpaid interest warrants.

"This obligation is issued in part payment of a subscription of five hundred shares of one hundred dollars each, of the capital stock, of said Lyons Iowa Central railroad company, made by the said Judge of said County Court of said county, on behalf of said county, by authority of an act of the General Assembly of the State of Iowa, passed February 5, A. D. 1851, and of a vote of the qualified voters of said county, taken in pursuance thereof.

· "In testimony whereof, I, the Judge of said County Court of said county of Cedar, in the State of Iowa, have hereunto set my hand and affixed the seal of said county, this first day of June, A. D. 1853.

( Seal. )      S. A. BISSELL, Judge of the County Court
                   of the county of Cedar, of the State of Iowa.

"Attest: J. W. CATTELL,
      "Clerk of the Court."

Each of these bonds has attached to it, forty coupons, or interest warrants, promising to pay the semi-annual interest at the time it falls due, of one of which the. following is a copy:

"Interest warrant No. 2, of bond No. 1.

"The county of Cedar, in the State of Iowa, will pay to the holder hereof, at the Bank of the Commonwealth, in the city of New York, on the first day of June, 1854, thirty dollars, for interest due on that day, on bond No. 1, issued for subscription to the stock of the Lyons Iowa Central railroad company. By order of the County Court of the county of Cedar, State of Iowa.

                              "J. W. CATTELL,
"$30.          ,          Clerk of the county of Cedar."

The railroad company is alleged to be a corporation in

the State of Iowa. The petition alleges that the present bond was, on the 4th of July, 1853, assigned and indorsed by the said company, to Henry P. Adams, of which assignment the following is a copy:

"In pursuance of an order of the Lyons Iowa Central railroad company, made on the books of said corporation, bearing date July 4th, 1853, we, the undersigned, William G. Haun, Vice President of said company, and countersigned by James McCoy, Secretary thereof, do hereby, on the part of said company, assign and transfer the within bond to Henry P. Adams or order, for value received.— Witness our hands, and the seal of said corporation, at Lyons, this 4th day of July, A. D. 1853.

"W. G. HAUN, Vice President.

"Countersigned,

"JAMES McCoy, Secretary."

To this assignment is attached the seal of said corporation. And it is averred, that on the same day and year, the said H. P. Adams assigned and indorsed said bond to the plaintiff, by the words "Pay to James Clapp or bearer."

In brief, the bond is for one thousand dollars, payable in twenty years from date, which is the 1st of June, 1853, at the Bank of the Commonwealth, in the city of New York, with coupons attached for each semi-annual payment of interest, payable at the same place. The action is, in fact, brought upon certain of these coupons, but the bond itself is set forth in the petition. There was a demurrer to the petition, upon the ground, among others of less bearing, that the county could not be sued originally in the District Court; and that the county and the County Judge had no authority to make the bond. This demurrer was overruled by the District Court, and the defendant filed an answer:

I. Denying the making and the assignment of the bond.

II. Denying that the plaintiff is a *bona fide holder*.

Clapp v. The County of Cedar.

III.   Denying that the property in the bond is in the plaintiff.

IV.   Alleging that the bond was not issued under authority of law, for the following reasons:

1.   The County Judge did not submit the question to the people.

2.   No notice of the question was given to the voters.

3.   No tax was proposed and adopted.

4.   The proposition and the result of the vote were not entered of record.

5.   There was no publication of the adoption of the vote.

6.   No requisite of Chap. 15 of the Code was observed.

V.   The answer further alleges, that the said Lyons company never had possession of the bond, nor was it ever delivered to the company, but that Henry P. Adams, Wm. G. Hann, James McCoy, and others not known to defendant, pretending to represent the company, colluded and conspired together, and by fraud, misrepresentation and deceit, unlawfully, got possession of the bond, and afterward fraudulently, and without authority of law, or of said company, pretended to assign the same to the said Henry P. Adams, who, in the whole transaction, was the leading spirit and wholesale swindler.

VI.   The answer then farther alleges, that the said bond and coupons were obtained from said county by fraud and misrepresentation, and without any consideration, in this, to-wit: That the then acting Judge of the county, issued said bond without authority of law, or of the people of the county, in consideration that said company were about to, and would, build and maintain a railroad through said county; and the pretended agent of said company so represented to the said County Judge, and relying upon such representations, and supposing that said pretended officers and agents were authorized on behalf of said company, to so represent, and receive said bond, the said Judge delivered said bond to one Henry P. Adams,

and others, who well knew that they had no authority to act for said company, and knew that their representations were false, and that said company did not intend to build and maintain a railroad through said county.

VII.   By an amended answer, the defendant denies that the bond and coupons were indorsed and assigned, as stated, by the company to Adams, or order, and that Haun and McCoy had any power, authority, or right, to assign the same; and that such order, as is alleged, was made on the books of the company, or such authority given.

VIII.   And then the amended answer proceeds as follows, the same being here set out in full: "And this defendant, further answering, saith, that on or about the 1st of March, 1853, the County Judge of Cedar county adopted an order, in substance as follows: 'Ordered that the question be submitted to the decision of the legal voters of Cedar county, Iowa,—the question whether the county will aid to construct a railroad, to run through the county, by subscribing fifty thousand dollars to the capital stock of the Lyons Iowa Central railroad company—said amount to be expended only in the event of said railroad being constructed and running *centrally* through said county, and only to be applied in the construction of the same within the limits of the county, the payment of the amount thus to be subscribed, to be paid for as follows: The county to issue her bonds for the sum of fifty thousand dollars, payable in twenty years, with interest, to be liquidated by an annual tax, to be continued from year to year until the whole amount is paid, of two and one-half mills on the dollar of the county valuation, as shown by the assessment roll.   The form in which the question shall be taken and voted upon, shall be as follows: the votes in favor of the measure, shall be written or printed, 'For the Lyons Railroad'; the vote against the measure, shall be printed or written, 'Against the Lyons Railroad;' and said measure shall be submitted and voted upon at the regular election on the fourth day of April next.'

"And this defendant further saith, that by the express

terms of the order aforesaid, the said amount of fifty thousand dollars, was 'to be expended only in the event of said railroad being constructed and running centrally through the said county, and only to be applied in the construction of said road within the limits of the said county of Cedar,' the payment of the amount thus subscribed to be provided for by the issue of bonds as aforesaid. This defendant further states, that under date of May 2d, 1853, the County Judge caused the following to be entered upon the records of said Cedar county, viz: 'At a County Court begun and holden on this day, it appearing from the county canvass, that there were, at the election held in Cedar county, on the first Monday in April, 1853, a majority of votes cast in favor of Cedar county issuing bonds to the amount of fifty thousand dollars, to aid in building the Lyons Iowa Central road, and subscribing for the like amount of the capital stock of said railroad company, therefore, it is considered, that said vote, being that of a majority of all legal votes cast for and against the proposition aforesaid.' That afterwards, on some day unknown to this defendant, the following further entry was made, immediately following the entry last above named, viz: 'That on its being made satisfactorily to appear to the County Judge, that said railroad will be constructed centrally through Cedar county, that the said county subscribe fifty thousand dollars to the capital stock of said railroad company; and the same be paid for by the county issuing fifty bonds of one thousand dollars each, with interest at the rate of six per cent. per annum, payable semi-annually, with coupons attached—said bonds to be payable in twenty years; and that in accordance with the decision of the proposition aforesaid, that the principal and interest of said bonds, be paid for by an annual tax of two and one-half mills on the dollar of the county valuation, as shown by the assessment, to continue, from year to year, until the whole of the principal and interest of said bonds is paid. And it is further considered, that the County Judge make arrangements to secure the expenditure of the means raised by the sale of

said bonds, within the limits of Cedar county—all of which . is in accordance with the proposition decided by the vote aforesaid.'

"And this defendant, further answering, saith, that there is nothing of record, or on file, in reference to the aforesaid bonds, in the County Court of the said county of Cedar, further than is above set forth; nor is there any thing of record showing that the said county ever subscribed fifty thousand dollars, or any other sum, to the capital stock of the said railroad company; yet defendant is informed that Samuel A. Bissell, then acting County Judge, on his own motion, did issue twenty bonds of one thousand dollars each to the said company, of which the bond set out in the plaintiff's petition, is one; and the coupons set out in the petition and amended petition, belong to, and were attached to, the said bonds so issued by the said Bissell. And this defendant further saith, that the said bond sued on, as well as the coupons sued on, were issued without authority of law, to the said railroad company; for this reason, in addition to other reasons set forth in the answer of defendant, that the said bond and coupons were issued before the said railroad was constructed, and because, the said railroad has never been, and is not yet, constructed through the said county, centrally or otherwise; nor was the money in the said bond mentioned, applied in the construction of said railroad within the limits of said county of Cedar. And defendant avers, that the said railroad company is bankrupt, insolvent and dissolved. And defendant further states, that the consideration for which the said bond and coupons were issued as aforesaid, has wholly failed, and the condition on which said bond and coupons were to be issued and paid, viz: the construction of said road as aforesaid, has never been fulfilled—of all which the plaintiff is bound in law to take notice."

To all the allegations of those parts of the answers, numbered 4, 5, 6, and 8, and which allege that the bond was not issued under authority of law, for various reasons; that Adams and others, fraudulently obtained possession there-

Clapp v. The County of Cedar.

of; that it was obtained from the county by fraud and misrepresentation; that the bond was issued before the road was built, and that it has not yet been constructed; that the consideration has wholly failed; and that the company is insolvent, and is dissolved—the plaintiff demurred, and assigned as cause for demurrer:

1. That the bond, being issued by the proper officer of the county, recites on its face that it was issued in pursuance of an act of the General Assembly, and a vote of the people thereon, and that there is no allegation of actual notice to the plaintiff, that it was not issued thus in conformity with law, nor any denial that plaintiff is a *bona fide* holder.

2. That the county is estopped by the recitals in its bond.

3. To the fifth cause in the fourth allegation of the answer, that no notice of thirty days or otherwise, was given, of the adoption of the proposition, the plaintiff demurs, because no such notice was necessary.

4. To the sixth cause in the fourth allegation of defendant, that none of the requirements of chapter 15 of the Code, were complied with, the plaintiff demurs, for the reason, that the answer does not specify what requirements were not obeyed.

5. To that part of the answer numbered 5, which avers that the company never had possession of the bond and coupons, but that Adams and others conspired and by fraud, obtained possession thereof, and that he fraudulently assigned, or pretended to assign, the same to Adams, the plaintiff demurs, for reason:—1. That the answer does not aver any fraud on his part in getting the assignment and possession of the bond, nor any notice to him of any fraud or misrepresentation in obtaining the possession; 2. That the fraud and misrepresentation by means of which Adams obtained possession, is not specially set forth.

6. To that portion of the answer numbered six, which avers that the bond and coupons were obtained from the county by fraud and misrepresentation, and without con-

sideration, the plaintiff demurs, for reason that it is not alleged that he had notice of those facts.

7. To that portion of the amended answer numbered 8, which sets forth the records of the county, the plaintiff demurs, and insists that they constitute no bar to the action; and that if the records are as set forth, he is entitled to recover, and is not bound to take notice of the failure to build the road, nor of the insolvency of the company.

The record then shows that this demurrer was sustained by the Court, in all its parts; and that the issues of facts, being submitted to the Court, were found for the plaintiff and judgment was rendered in his favor. The errors assigned by the defendant and appellant are, in substance, as follows:

I. That the Court overruled the demurrer of the defendant to the petition of the plaintiff, thereby deciding—

1. That this suit was properly brought in the District Court, in the first instance;

2. That the County Judge had legal authority, power and right, to execute and issue the bond and coupons on which suit is brought.

II. That the Court sustained the demurrer of the plaintiff to the answer and amended answer of the defendant, thereby holding—

1. That no submission of the question to borrow money—no notice of such submission—no proposition to levy a tax—nor adoption of a tax—nor entry or publication of the result—are necessary to the validity of the bond;

2. That the recitals in the bond operate as an estoppel on the defendant;

3. That the plea of fraud was insufficient;

4. That the matters set up in the amended answer did not constitute a defense to the plaintiff's action.

*Cook & Dillon*, for the appellant.

The first question is, whether the suit was properly brought in the District Court in the first instance, the claim never having been presented to, demanded of, or

rejected by, the County Judge or Court. We answer, No! This is in effect a jurisdictional question, and the objection appearing on the face of the papers, can be taken by demurrer, or will avail on error. See 1 Monell's Practice, 540; *Grant* v. *Tams*, 7 Munroe 218. "Where the lack of jurisdiction appears on the plaintiff's pleadings, a demurrer only is necessary, or it will avail on error." Sec. 1576 of the Code, gives the District Court general original jurisdiction, both civil and criminal, *where not* otherwise provided *by law*. The District Court then, has jurisdiction, unless it is *otherwise provided* by the Code. It appears clear that the Code intended that all claims against the county, should be presented to, and passed upon by the County Judge or Court. It so declares expressly. See 2d *Sub. Sec.* 106 *of Code; Sec.* 131, *allowing appeals.* There is no difference, in legal effect, between the claim sued on, and any other claim for money against the county, and if this plaintiff can *drag* the county into the District Court, under these circumstances, then any creditor of the county can do the same thing, and Sec. 106 of the Code, is held for nought. We have understood that the predecessors of the present Supreme Court, have decided in accordance with the view above presented; but of this we have no certain knowledge.

The next question that meets us, is, as to the legal power of the County Judge to execute and issue the bond and warrants declared on. We do not purpose to argue at length the Constitutionality of county subscriptions to Rail Road Corporations. This question has, we understand, been fully argued at this term of the Court, and will doubtless receive, as it certainly merits, its most careful and weighty consideration. The question as to the Constitutionality of municipal subscriptions to Railroad Corporations, has generally arisen, as in the case of *Sharpel et. al.* v. *Mayor of Philadelphia*; 2 Livingston's Law Mag., 124, where the Legislature has passed an act expressly authorizing such subscriptions; thus bringing up plumply, and plainly and only, the question whether the Legislature

has, or can have, the constitutional power to pass such an act. And the question, thus arising, has been decided both ways, and is still *questio vexata.*

No such question is presented in this case, because the General Assembly of this State has never passed an act allowing such subscriptions, unless it may be found in Sec. 114 of the Code. It has never been contended that a city or county, without the *express* sanction and authority of the Legislature, could legally subscribe to the stock of a private corporation. A long way this side of the question of constitutionality, therefore, is the question, whether there is any authority given by the Code, allowing such subscriptions as we are here speaking of,—or in other words, the question as to the proper construction of Sec. 114 of the Code. If this, and the succeeding sections are carefully examined, it will be seen that they refer to county matters,—to matters over which the County Court has exclusive jurisdiction given it by the Code. It never was intended by the term "road," to embrace "railroads;" nor can any such construction be fairly given to it. In July, 1851, when the Code went into effect there was not a Railroad in the State, nor such a thing as county subscriptions to Railroad Corporations thought of. The word 'aid' with reference to public buildings; the words *'other local regulations,'* in Sec. 114, and the whole of Sec. 118, show most conclusively that 20 years subscriptions to aid in building a Railroad, were never intended. If any doubt remained on this point, it is removed by a dictionary clause defining the meaning of the word 'road.' Sec. 26 of Code.

It is well settled, that it is allowable and proper to raise by demurrer, every question which arises on the face of the papers. The bond is made part of the petition, and it recites the laws of the State of Iowa, as the authority under which it is issued; and consequently a party contesting the proposition that the laws of Iowa do give such authority, can raise this objection by way of demurrer.— Before approaching directly the discussion of the questions raised by the demurrer of the plaintiff, to the answer and

amended answer, we beg leave to advert to some general and well settled propositions of law *germain* to the subject, and which will, we think, tend to guide us to correct conclusions.

The officer who issued the bond declared on, (the County Judge), is an officer of special and limited jurisdiction and power. He derives his official life from the Code, and from no other source; the Code has endowed him with all the powers he possesses, and these are special, limited and trenchantly-defined. It prescribes what the County Judge may rightfully do; and beyond the *express* authority it gives him, he is utterly powerless. Authority not *expressly* granted, is not conferred; powers not expressly given, are withheld. He is the agent or attorney in fact of the county, (*Argument of Kent and Webster, in Delafield* v. *Illinois*, 8 Paige, 529), and possesses no power or authority to bind the county, except so far, and no farther than the Code—his letter of attorney—expressly authorizes. This agency or attorneyship is directly avowed in the bond, which purports to be made by him, for and " on behalf of the county," and the bond binds not the county (his principal), unless he had legal right and authority to issue it. For example : If the County Judge should issue bonds and subscribe to stock in a railroad company, without the prior vote of the people, such bonds would not be binding on the county. This subject, the power of officers who act by virtue of statute authority alone, is generally spoken of in the books, under the name of STATUTORY POWERS, and the law may be considered clearly settled in accordance with the view above presented. If the County Judge who issued the bond in question, possessed any legal power to do so, such power is the exercise of a *naked, statutory* and *special* authority, depending *exclusively* upon the statute for its existence, validity and mode of execution.

Extraordinary as it may seem, these propositions were controverted, or their applicability denied, in the Court below; and this shall be our apology, if any be needed, for

some citations of authority in their support. Among the many authorities that crowd upon us, we refer to the following, as being especially in point, or strikingly analogous. *Doughty* v. *Hope*, 3 Denio, 595; *Sharp* v. *Speir*, 4 Hill, 86; *Sharp* v. *Johnson*, 4 Hill, 92; *Varick* v. *Tallman*, 2 Barb. S. C. 113; *Striker* v. *Kelly*, 2 Denio, 323; *In the matter of Beekman St.* 20 John, 269; *Stafford* v. *Mayor et al Albany*, 7 John, 541; *Early* v. *Doe*, 16 Howard, U. S. 610; *Young* v. *Martin*, 2 Yeates, 312; *vide* cases cited in Blackwell on Tax Titles, page 47; *Williams et al* v. *Peyton's lessee*, 4 Wheaton, 76; *Barker* v. *Rule's lessee*, 9 Cranch 64, where, although the question was not raised, it was admitted by Court and counsel. A rich vein of authorities, on this subject, may be found in Blackwell on Tax Titles (against which book, there seems to be, in many quarters, an unreasonable prejudice), at pages 45–47 and 51. It is needless to argue the analogy of the above cases, to the one at bar, as respects the point now under consideration. It is clear and incontestible.

The County Judge in issuing these bonds, acting, and professing to act, as the agent of the county, the plaintiff, who relies upon the act of such agent, is bound in law to know whether such agent has power, and to what extent, to bind his principal. A person dealing with an agent of limited powers, is bound to examine and know the authority of that agent. *Vide* Chitty on Contracts, 58; *Schimmelpennick* v. *Bayard*, 1 Peters, 264, 15 East. 43. The County Judge has no authority except what is derived from statute; he is the mere agent of the county; see Code of Iowa, and the Code is his Special power of attorney. The principal is not bound by the act of his agent, beyond the authority of the agent. Story on Agency, Sec. 160–170; *Beals* v. *Allen*, 18 Johns. 363. Again, the bond on its face, expressly referring to the laws of the State, to a vote of the people, &c., &c., every person taking such bond, is bound to take notice of the provisions of the law, and to know whether such a vote ever was taken, the nature and terms of the proposition voted on, and the result of the vote.

Clapp v. The County of Cedar.

The Supreme Court in New York city, in the case of *A. L. Hogvet* v. *Rensselaer Bank,* not yet reported, have decided an important principle illustrative of the point we are now making. The Bank issued its ordinary negotiable stock certificates. On their face, these certificates appeared to be transferrable in accordance with the By-Laws of the corporation. By these By-Laws it was provided that the Bank would recognize no transfer, if the party transferring was a debtor of the Bank, until such debt should be paid. A party holding some of these negotiable stock certificates, sold and transferred them to another party, who did not know that the vendor owed the Bank, nor that such was the provision of the By-Laws. Held, by the Court, that as the certificates contained a reference to the By-Laws, the party buying was bound to take notice of those By-Laws, and the Court refused to compel the Bank to recognize the transfer, until the purchaser should pay the debt due by his vendor to the Bank. *Vide,* also, as illustrative of this point, and going to establish it: *Everitt* v. *Thomas,* 1 Iredell, 252; *Ritter* v. *Barrett,* 4 Dev. & Batt. 133; *Field* v. *Huston,* 8 Shep. 69; *Thomas* v. *Hatch,* 3 Sumner, 170.

We pass now to the consideration of the questions raised by the plaintiff's demurrer to the answer and amended answer.

I. The answer. This, among other defenses, sets up "that the pretended bond and coupons were never issued by authority of law, in this," viz :

1. The County Judge of Cedar county never *submitted* the question of borrowing money to the people of the county, as provided by law ;

2. No *Notice* of the submission was ever given ;

3. Nor was any proposition in a submission, made to lay a tax, &c., nor any tax adopted ;

4. The County Judge did not enter the result on the minute book, as required by law ;

5. "The County Judge failed to publish notice of result."

Strange as it may seem, this part of the answer was met, not by a traverse, or by confession and avoidance, but by demurrer, which, of course, admits the truth of the plea. For cause of demurrer, the plaintiff states, that the bond and coupons, "issued by the proper officer of the county, "recites on its face that the bond was issued in pursuance "of an Act of the General Assembly and a vote of the peo- "ple thereon, and there is no allegation of notice to the "plaintiff that it was not, or denial that he is a *bona fide* "holder; *and without an allegation of notice to the holder, he* "*being an assignee, the plea is not good in law.*"

II.  "Because the county is *estopped* by the recital in its own bond."

The District Judge sustained the demurrer.  Can this be law?  The answer sets up that the question was *never submitted;* that no *notice* of submission was ever publish- ed; nor the result of any vote entered on the records of the county, &c.  The court below held this plea to be bad, because it did not allege that the plaintiff had actual notice of these facts, and because the county is *estopped* by the bond from denying them.  These objections are, we think, already sufficiently answered.  The County Judge, as the agent of the county, has no authority or power, on his mere motion, to issue such a bond as the one sued on; and the plaintiff is bound to know at his peril, whether the conditions on which, and on which only, his right to issue such bonds rests, have been complied with.  He is bound to know whether any law exists authorizing counties to subscribe to stock in railroad corporations; he is bound to know, if any such law does exist, whether its requirements have been complied with; whether notice was given; whether there was a submission, and what that submis- sion was; whether there was a vote, and what the result of that vote was.  We repeat with emphasis, that the pur- chaser is bound to know and at his peril enquire, as to these matters.  Why? because unless these requisitions have been complied with, the County Judge has no power to issue these bonds, and they are absolutely void.  In the

part of the answer we are now considering, the defendant voluntarily took upon himself the burden of impeaching the validity of these bonds, and of showing that they were issued without authority of law.

The defendant might have legally taken higher grounds, and required of the plaintiff to show that the necessary steps to render the issuing of these bonds valid, had been taken. *Williams et al.* v. *Peyton's lessee*, 4 Wheaton, 76; *Jackson* v. *Shepard*, 7 Cowen, 88; *Ronkendorf* v. *Taylor's lessee*, 4 Peters, 349; *Sharpe* v. *Spears*, 4 Hill, 76; *Sharpe* v. *Johnson*, 4 Hill, 92; *Striker* v. *Kelly*, 2 Denio, 323. At all events, the presumption in favor of the performance of official duty, is not conclusive, but may be overcome, by proof. *Doughty* v. *Hope*, 3 Denio, 594. But in the case at bar, the Court by sustaining the demurrer to this part of the answer, held not only that the *onus* was not upon the plaintiff, but also denied the right of the defendant to go behind the bond, to shew its recitals to be false, or the pre requisites of issue to be wanting. In the issue of these bonds, the County Judge acts, not as a judicial officer, but as the special and statutory agent of the county, and no presumption arises as to the regularity and validity of his acts as such agent; therefore the party who insists that such acts are regular and valid, must show them to be so. The issue of these bonds is entirely a matter of statutory regulation, much more so, than sales of land upon execution, or sales by administrators and guardians. And as the purchaser at sheriff's sale is bound to know and inquire, whether there is a valid judgment and execution, and as a purchaser at administrator's or guardian's sale is bound to know and inquire whether the necessary notice has been given, and the requisite order procured, so, for the same reason, is the purchaser of a statute-bond, like the present, bound to know and inquire whether the conditions upon which the validity of such bond depends, have been complied with.

As to the matter of *estoppel*, we understood the counsel for the Plaintiff to abandon that point, in his oral argu-

ment to the Court; but whether he abandoned it or not, it is sufficiently answered by saying, that *estoppel* does not apply, if the bond is not the bond of the defendant, and the *gist* of the defence set up on the part of the answer is, that the bond, being issued without authority of law, is not the bond of the defendant, and, therefore, the county is not estopped from denying its recitals. No enlargement can make this more obvious. We would only say, however, that if the doctrine asserted by the adverse counsel, and by the Court below, be law, any County Judge, on his own mere motion, may issue bonds like the one sued on, to an unlimited amount, and if he *only recited* that they were issued in pursuance of law, and a vote of the people, the county is bound to pay them, and is estopped from denying the recitals, even if there is no law authorizing him to issue them, and even if no vote of the people was ever, in fact, had. The decision of the Judge below, on this point, is in direct conflict with every decision ever made. Recitals by public officers, are not regarded in law, as in the nature of estoppels; so far from this, such recitals are not even *prima facie* evidence of the truth of the matters recited, and may always be disproved. As a type of the character of the decisions on this point, we quote from the decision in *Varrick* v. *Tallman*, 2 Barb., S. C. 113, where the Court says: "Neither the recitals in the Comptroller's deed, nor the presumption in favor of the official acts of public officers, can dispense with proof of the facts which conferred on the Comptroller, power to sell." If the recitals in the bond sued on, dispense with proof of the facts which conferred on the County Judge power to issue it, still they cannot *cut off*—*estop*—the defendant from disproving them.— *Vide* also, *Williams et. al.* v. *Peyton's lessee*, 4 Wheaton, 76; *Jackson* v. *Shepard*, 7 Cowen, 88, and other cases cited in *Varrick* v. *Tallman*, 2 Barb., *supra*; Blackwell on Tax Titles, 93.

In the last plea set up in the answer, the defendant alleges that the bond and coupons, described in the petition,

Clapp v. The County of Cedar.

"were obtained by fraud, and misrepresentation, and without any consideration;" specifying particularly, wherein such fraud and misrepresentation consisted. To this section of the answer, plaintiff also demurred, because actual notice, to him, of these matters is not alleged. Admitting, for the sake of the argument, that the bond and coupons are negotiable paper, in the commercial sense, and governed by the law applicable to such paper, even in this view, what is the law? Most confidently do we submit it to be as follows: "If a bill or note is shown by the defendant to have been fraudulent in its inception, or fraudulently put in circulation, then the *onus* is thrown on the plaintiff, to show that he came by its possession fairly, and without any knowledge of the fraud." *Monroe* v. *Cooper*, 5 Pick., 412. In this case, Wilde, J. remarks, that if the defendants prove the fraud, "they will have a "right to know how the plaintiff obtained it, (the note); "and if, in such case, he, (the plaintiff), cannot exonerate "himself from all participation in the fraud, or knowledge "of it, he can have no right in law or equity, to recover." Earle J., said: "If the illegality is proved, it raises a "presumption that the holder took the instrument without "value, and so the burden of proving value, is cast on the "plaintiff, so far as this, that if no evidence be given on ei- "ther side, the presumption that he took it without value, "prevails." *Vide* also the case of *Fitch* v. *Jones*, 1 Jur. N. S., Part 1, 854; 24 L. I. Q. B., 293, cited in Livingston's Law Mag., for January, 1856, 96, to which case particular attention is asked.

In the same case, Lord Campbell, C. J., states, the reason of the presumption of law, that the plaintiff took the instrument without value, as follows: "Where fraud or illegality is established, there is such a presumption, because in such cases, the law supposes that the original party, not being able to sue upon the instrument himself, has handed it over to another to sue for his benefit."

In the case before the Court, the demurrer admits the

plea of fraud, and the law, therefore, presumes that the plaintiff took the bond sued on, without consideration, and with notice of the fraud. See leading case of *Bailey* v. *Bidwell*, 13 Meeson & Welby, 173; *Holmes* v. *Kaisper*, 5 Binney, 469; *Grant* v. *Vaughan*, 3, Burrows, 1,523; Peake's Ev., 220; Kyd's Ev., 206; *Duncan* v. *Scott*, 1 Campbell, 100; *Rees* v. *Marquis of Headfort*, 2 Camp., 574; *Beltzhoover* v. *Blackstook*, 3 Watts, 26; *Vallett* v. *Parker*, 6 Wendell, 615; *Munroe* v. *Cooper*, 5 Pick., 412; *Knight* v. *Pugh*, 4 Watts & Sargent, 445; *Brown* v. *Street*, 6 Watts & Sargent, 221; *Vathir* v. *Zane*, 6 Grattan, 346, 263; *Conroy* v. *Warren*, 3 Johnson's Cases, 259; *Woodhall* v. *Holmes*, 10 Johnson, 231; *Rodgers* v. *Morton*, 12 Wendell, 484, 487. If it is urged that the defendant ought to have alleged that the plaintiff took the bond without value, or with notice. We reply that no such allegation is necessary. Illegality and fraud, being pleaded, and, by the demurrer admitted, the law presumes, that the plaintiff is not a *bona fide* holder. If this allegation was made, the defendant would not have to prove it, for if he proves (or the plaintiff admits) the fraud, it is, in the language of Alderson B., (in *Bailey* v. *Bidwell*, 13 M. & W., 77) equivalent to saying: "It is an illegal instrument, and I put it in issue, whether you are an endorser for value." That presumptions of law, need not be alleged, requires no authority to prove, and to require it is to require what the law presumes, and what the party need not prove. Nor is it necessary to allege beyond what it is necessary in the proof to establish; therefore, on a plea of fraud, like the present, it is not necessary for the defendant to allege notice or want of value, for if the fraud is established or admitted, the law presumes that the plaintiff took the instrument in bad faith, and he, the plaintiff, (and not the defendant), must shew the contrary, before he can recover. Even a *bona fide* holder of negotiable paper, which has been obtained by fraud, theft or robbery, is entitled to recover only the amount he has actually advanced. See Story on Prom. Notes, 3d. Ed., section 191.

Before we pass to the questions arising upon the amended answer, we wish to allude to the legal character of the bond sued on. The plaintiff, as will be seen from the record, claims that the bond and coupons are negotiable paper, with all the incidents of negotiability; hence, the demurrers to the defences set up in the answer, because it is not alleged that he had notice of them. We deny that the bond and coupons are properly to be considered as negotiable paper, and that the law of ordinary commercial paper is applicable to them. The difference between the two are many and obvious. Every person who is *sui juris*, has a right to issue his negotiable paper to any person, and for any amount. The transactions out of which ordinary commercial or negotiable paper grows, are *in pais*, and known in general only to the parties to the paper, and being *in pais*, it would be impossible, in most instances, for assignees to ascertain the real consideration for which such paper was given, and hence the law does not require it of them. But the case of county bonds to railroad companies is vastly different. The County Judge who issues them, has no inherent, absolute right to do so; his right, if it exists at all, exists only when certain, well-defined pre-requisites are complied with, which exists, not *in pais*, but of record, and open to the inspection of all. Therefore, all persons are required, and are and can be reasonably required, to know at their peril, whether such bonds have been properly and legally issued. These bonds, not being regarded as ordinary negotiable paper, it follows, hence: that if the defence set up is, that they were illegally issued, the defendant is not bound to go further, and allege expressly that the plaintiff had notice of such illegality, because he is bound to take notice of it, and because not being negotiable paper, like bills and notes, the assignee must give notice to the *maker*, in order to constitute a valid assignment. The Court has already so decided this last point, in the case of the *Merchants' and Mechanics' Bank*, v. *Hewitt*, 3 Iowa, 96, and to which reference is made. An instrument like the one sued on,

is not negotiable at common law.  In the case of the *Mer. and Mech. Bank* v. *Hewitt*, in speaking of instruments falling under section 949 and 950 of Code, such as a warehouse receipt to deliver corn to the order of the depositor, the Court uses this language: "In order to constitute a valid assignment of an instrument in writing, like the present, it is necessary that notice of the assignment be given to the maker." The whole law in reference to what is, and what is not negotiable paper, is collected in American Lead. Cases, 303, 326, and particularly see *Overton* v. *Tyler et al.*, 3 Barr. 346, deciding that a note, with a warrant of attorney attached, is not negotiable. The result of the authorities is thus stated in 1 American Leading Cases, pages 326 and 327: "In this country, no instruments are negotiable, but *regular* promissory notes and bills of exchange." See *Birchead* v. *Brown*, 5 Hill, 635, where Justice Bronson makes some very sensible remarks, which we would like to quote, had we the space. Also, see *Clark* v. *Manufact. Co.*, 15 Wend. 256; *Lewis* v. *Wilson*, 5 Black. 370; *Treval* v. *Fitch*, 5 Whart. 325, 351; 1 Parsons on Contracts, 169. The bond sued on, not being negotiable paper, is subject to the equities between the parties, unless the Code has declared otherwise. *Hopkins* v. *Railroad Co.*, 3 Watts, and Serg. 410. Bonds given by the East Indian Co. were held not negotiable, though payable to order and bearer, and a statute was necessary to be passed in order to make them so. *Glyn* v. *Baker*, 13 East. 509; Chitty on Bills, 109; *Lang* v. *Smith*, 7 Bing. 284. Again, the bond in question is prolix, and has few of the qualities of ordinary negotiable paper, which (says C. J. Gibson, one of the ablest of American Jurists, in *Overton* v. *Tyler, supra.*) is framed in the fewest possible words, and those importing the most certain and precise contract. "But a negotiable bill or note, (says the distinguished Judge, using a happy illustration,) is a carrier without luggage." The bond in question, so far from possessing the precise, simple and definite attributes of negotiable paper, is heavily freighted with the

Clapp. v. The County of Cedar.

luggage of recitals and stipulations of various kinds.  In the case in 1st Stockton's reports, so confidently related by Judge Grant, there was no question of the right of the canal and banking company to issue its bonds, and but little question that this right had been properly exercised.  The main questions decided in that case, were as to the right of parties holding these bonds as collateral, and the right of purchasers under them at public sale.

We now pass to the amended answer.  Under section 1752 of the Code, allowing a party to state in his pleadings, as many grounds of defence as he may think material, the defendant filed an amended answer, which sets forth " all that there is of record or on file in the County Court of Cedar county, in reference to the said bonds." The amended answer sets up, that on 1st of March, 1853, the County Judge ordered the question to be submitted, " whether the county will aid to construct a railroad, to " run through the county, by subscribing fifty thousand " dollars to the capital stock of the Lyons Iowa Central " railroad company, said amount to be expended only in " the event of said railroad being constructed and running " centrally through the said county, and only to be applied " in the construction of the same within the limits of the " county, the payment of the amount thus subscribed to " be provided for as follows," viz : by the issue of bonds, &c.  This, the Court will observe, is only the order of the Court for the submission.  The next record is under date of 2d of May, 1853, wherein the County Judge states that there was an election in April, &c., but does not give the number of votes, or the result of the vote at large, as required by law, and concludes by pronouncing judgment upon the vote in the following queer and unintelligible manner :  " Therefore, it is considered, that said " vote, being that of a majority of all the legal votes cast " for and against the proposition aforesaid. "  The next record under the same date is especially worthy of attention.  It begins thus :  " That on its being made satisfac- " torily to appear to the County Judge, that said railroad

"will be constructed centrally through Cedar county, that "the said county subscribe fifty thousand dollars to the "capital stock of said railroad company, and the same be "paid for by the county's issuing fifty bonds," &c. What the Judge who made this record meant, we confess ourselves unable to determine. Did he mean that it having been made satisfactorily to appear to him that the said railroad would be constructed, the county does now subscribe fifty thousand dollars to the stock of the railroad company? Or did he mean that when it shall be made thus to appear, the county will then subscribe? However this may be, we invoke the especial attention of the Court to the following statements:

1. The record does not show that any proposition was ever submitted to the voters of the county. All that the record discloses is, that in March, 1853, the County Judge made an order for a submission of a certain question to the people of the county. It by no means follows, nor is there any proof, that this, or any other question, was ever, in fact, submitted or voted upon.

2. There is nothing in the record or on file, showing that four weeks notice, or any notice, was ever given of the submission of the question to subscribe stock to the Lyons railroad company. On this point, the record is totally silent. Was any notice of any kind ever given? Was there a newspaper in the county, and was notice given through that medium? Was it given by posting as required by section 115 of the Code? Were any of the requirements of this section ever complied with? The statute is particular in requiring in all cases, "at least four weeks notice." Was this done? Between the time of the order, and the 1st of April, scarcely more than four weeks intervened. Look at the record; and answer who can? The defendant alleged that no such notice was in fact given, and the Court below held that this defence was not good, unless accompanied with the further allegation that the plaintiff knew this, when he took the bond.

3. There being nothing to show that any, or if any,

what proposition was voted on by the people, it does not appear that any provision to levy a tax accompanied the proposition, without which any vote by section 116 of the Code, is of none effect, and void.

4. The proposition voted on, and the result of the vote, are not entered at length on the record, as required by section 119 of the Code. The record does show that a vote on some proposition was had, but does not show what that proposition was. If any proposition was in fact submitted, it may have been materially different from the one ordered by the court. We alluded to these matters particularly, because until these requisites are complied with, the vote has not the force and effect of an act of the General Assembly.

5. There is nothing of record, or on file, showing that the county ever subscribed any sum to the stock of said railroad company, for the payment of which stock, and for that only, bonds were to be issued, nor does it appear that the county ever issued any bonds at all to this railroad company.

If this Court shall assume, (for of these matters there is no evidence of record or otherwise,) there was a proposition submitted, and that the proposition which the County Judge ordered to be submitted, was the one voted on, and that notice, and due notice was given, still we maintain, that the County Judge had no legal right or authority to issue these bonds; and if he exceeded his authority, then, as we have shown, his acts are not binding upon the county. We now call especial attention to the phraseology of the order of submission. It is this: "Will the county aid "to construct a railroad to run through the county, by "subscribing fifty thousand dollars to the capital stock of "the Lyons Iowa Central railroad company, said amount "to be expended only in the event of said railroad being "constructed and running centrally through the said coun- "ty, and only to be applied in the construction of the same "within the limits of the county." Thus, by the fundamental requirements of the submission, the money was

"only to be expended in the event of the construction of the road;" and "applied in the county," etc. The people of the county, it might well be supposed, would not hesitate to vote in favor of such a proposition, as it was so limited and qualified that they did not part with their money, unless they obtained their road. Yet the record shows that these bonds were issued, not after the road was con- structed, and not for the purpose of expending them in the construction of the road in the county, but on the contra- ry, they were issued, to use the language of the Judge, "on its being made satisfactorily to appear to the County Judge that the said railroad will be constructed," etc. All we have to say is, that the people did not vote in favor of a proposition to expend fifty thousand dollars of their mo- ney, when Judge Bissell should be satisfied that the road would be built.

The amended answer sets up that the road was never built, nor was the money of any of the bonds expended within the limits of the county. To this amended answer, the plaintiff also demurred; the Court below sustained the demurrer; the defendant stood by his answer and amended answer; and the Court rendered judgment against the county.

In the oral argument for the plaintiff, it was mentioned that the matter of the validity of these bonds, had once been before this court. This is true; but at the same time it is equally true, that it was before the court in such a shape, that only one of the questions which we now make was decided, and that only by a bare majority—Judge Greene dissenting. We invoke the particular attention of the court to the record in the former suit. *See S. A. Bis- sell, county Judge,* v. *State of Iowa, ex relat. Leech et al.—* In that case, the answer set forth specifically and minutely, that all the requirements of the code had been complied with; that notice was given of the submission; what that submission was; that the votes were canvassed, and the re- sult of the vote was specifically stated; that a record was made, the result published as required by law, &c. To this

the relators demurred, thereby admitting the statements of the answer to be true. In fact, the only point on which the opinion of the court was sought in that case, was as to the right of the Judge, (admitting the vote and everything connected with it to be regular,) to issue the bonds before the road was constructed. A bare majority of the court decided that he had this right; and the ground on which Judge Hall based his opinion was, that he could not see how the county could "aid" to construct a road, and yet not pay the money until it was constructed. Take the whole order of submission together, give effect to all of it, and is not the fair construction, and the construction which the voters would put upon it, thus:—"Will the county aid to build the railroad, by subscribing fifty thousand dollars to the stock, payable when the road is constructed, or during its progress through the county?" Is not this rendering substantial "aid" to the Rail Road Company? By it, they sell, at par, five hundred shares of their stock, payable as the work progresses, or when it is completed. The people of the county made with the Railroad Company just such a contract as almost every man makes with his mechanic: "build my house, and I will pay you as the work progresses or upon its completion." And is this not "aid" to the builder? Can effect be given to the *whole* proposition by any other construction? If so, what one?

*Whitaker & Grant*, for the appellee, in a written agreement too lengthy for publication in *extenso*, cited the following authorities: Code, § 93; 1726; *Steel* v. *Davis County*, 2 G. Greene, 469; Acts of 1843, 123; *The Pacific R. R. Co.* v. *Dubuque County*, 4 G. Greene, 1; *Raleigh & Gaston R. R. Co.* v. *Davis*, 2 Dev. & Bat. 451; Bouv. Law Dic. *Rood;* Code, § 974; Byles on Bills, 126; *Uther* v. *Rich*, 10 Adol. & E. 784; (37 Eng. C. L. 235;) *The State ex rel. Leach* v. *Bissell*, 4 G. Greene, 328; Code § 106; *Noyes & Co.* v. *R. & B. Railroad Co.* 1 Williams (Vt.) 110; *Ketchum* v. *City of Buffalo*, 21 Barb. 294; *Vallette* v. *Parker*, 6 Wend. 615; *Powers* v. *Ball*, 1 Williams, 662; Story on Bills, § 188; Chitty on Bills, 78; Bailey on Bills, 499;

*Fitch* v. *Jones*, 32 Eng. L. & E. 134; *Merch. & Mech. Bank* v. *Hewitt*, 3 Iowa, 93; *Overton* v. *Tyler*, 1 Am. Lead. Cases, 303; Code, § 947; *Delafield* v. *State of Illinois*, 8 Paige, 527; 2 Hill, 160; *Morris C. & B. Co.* v. *Fisher*, 1 Stockton, 699; *Woolkey* v. *Pole*, 4 B. & A. 1; *Georgia* v. *Melville*, 3 B. & C. 45; *Lay* v. *Smith*, 7 Bingh. 284; 1 Parsons on Cont. 240; *United States* v. *Arredendo*, 6 Peters, 729.

WOODWARD, J.*—The questions which arise in this cause, are numerous, interesting and important, but it will be necessary to express the opinion of the Court upon them, as briefly as possible. The first question is presented under the demurrer of the defendant to the plaintiff's petition, and is whether the District Court has original jurisdiction of the cause. This point was decided in the case of *Campbell* v. *County of Polk*, 3 Iowa, 467, as well as in *Steele* v. *Davis County*, 2 G. Greene, 469. In the first named of the above cases, this court sustained an action brought upon a warrant issued by the county Judge upon the county Treasurer. The statute means that unsettled, unliquidated demands for money against the county, shall first be presented to the proper auditing officer. But where a matter has already been presented and liquidated or allowed, and the county warrant, note, or bond, has been issued therefor, there can be no object in again presenting it, when only a new promise can result from it; and there is, perhaps, yet more force in the consideration, when the contract is by its terms made payable in a place distant from the county, as in the present instance.

The next question in the natural order of the cause, arises on the same demurrer to the petition. It is upon the authority of the county Judge to issue such a bond. It is the question whether a county can issue its bonds for a subscription to the stock of a rail-way company, whose road is to run through the county. This subject cannot have es-

* WRIGHT, C J., dissenting.

caped the observation, and to a considerable degree, at least, the attention of any lawyer of many years study and practice, since it has been much discussed in the United States. We, therefore, approach the subject, conscious of the magnitude of the considerations entering into it,—considerations touching the power of the Legislature to grant this authority to counties,—touching the nature of counties as municipal bodies, whose primary object is the government, in certain matters, of portions of the State,—and touching, also, the rights of majorities and minorities under our institutions. But we do not propose to enter into a discussion of these matters, as important as they are; both because the subject has probably been exhausted, and because of that which has taken place in this State in regard to it, to which reference will be made.

Upon the first step in the inquiry—that is, upon the inherent authority of a State to enter into these and similar internal improvements, no one has ventured to make a question. The second step would be, whether a legislature possesses the power to confer this authority upon a county. Few have doubted the existence of this power; the question having generally been, whether the power had been exercised, or whether a county possessed the desired authority, without a special grant. The mass of American cases, have sustained the power in the legislature; and it is probably necessary for us to say only, that whatever doubts we may tacitly entertain, or might suggest, were the question a new one, even here in this State, we shall let it rest upon those past decisions, and upon the considerations presented in the next stage of the inquiry.

That next stage is this—do the counties of this State possess this authority, whether inherently, or by express provision. If we were called upon to decide this question now for the first time, for this State, we should entertain heavy doubts of the existence of the power, upon any ground; and if the attempt were made to place it upon section 114 of the Code, under the power to aid in constructing roads, we should think very lightly of the argu-

Clapp v. The County of Cedar.

ment.  If the power exist, it must have some other
foundation.  But this is a subject on which change is dis-
astrous.  It is one on which we are bound by former de-
cisions.  Such an one has been made, and the public and
the world have acted upon it.  To change, now, would be
the worst of all repudiation—judicial repudiation.  The
first decision on a subject of this nature, by the highest
judicial tribunal of a State, at a time when the business of
the country is moving on, is final—it determines the pol-
icy of the State.  It is impossible to recede.  The world
waits and listens for the judicial determination, and then
acts accordingly; and in this case, has acted with vigor.
This question was determined in the case of *Dubuque
County* v. *The Dubuque and Pacific Railroad Company*,
14 G. Greene, 1, and in *The State* v. *Bissell*, 4 Ib. 328,
and five railways have commenced their progress across
this State, and several millions of dollars have been sub-
scribed by our counties.  Whatever we may think of this,
as a policy, the Court cannot arrest it, consistently with
any regard to the judicial character.  The trust must now
rest upon the intelligence of the people, and their repre-
sentatives.

Let us look at our judicial and legislative history on
this subject.  It is short, but yet effective.  The case of
the *Dubuque and Pacific Railroad* was brought to this
Court, expressly to test this question.  Judgment was
rendered, affirming the power in the county.  But it is ob-
jected, that no opinion in this cause is on record, or to be
found.  This is true, and consequently, we cannot know
the reasoning of the Court, except as gathered from the
dissenting opinion.  But we cannot ignore the fact of such
a decision, whatever the mischance by which the opinion
failed to be placed on record.  In the first place, a judg-
ment is rendered, implying such a determination.  In the
second place, Justice KINNEY wrote a dissenting opinion,
which is recorded, and whose basis is the existence of such
an opinion on the part of the majority of the Court.
Then there is the common understanding of the bar,

especially of those from that county. Again, in *The State ex rel. Leach* v. *Bissell*, HALL, J., in delivering the opinion of the Court, refers to such former adjudication, saying : "The same point having been decided at the June term, 1853, in *The Dubuque and Pacific Railroad Company* v. *Dubuque County*, it is not examined. This decision is not intended to sanction or deny the legal validity of that decision, but to leave that question where that decision has left it." Let us next see what the legislature has done, remembering that we are now in the " early times," when contemporaneous construction arises. By statute of 1854–5, (chapter 128, 1855, 190,) it is en · acted, that " whenever any company shall have received, or may hereafter receive, the bonds of any city or county, upon subscription of stock by such city or county, such bonds may bear interest at any rate not exceeding ten per cent.," &c., and the provisions of the act shall apply to any railroad bonds which have been heretofore issued, as well as to those which may hereafter . be issued. By the same statute, (chapter 149, 219,) it is enacted, that in " all cases where county, city, or town corporations have, or may hereafter, become stockholders in railroads, or other private companies, it shall not be lawful to issue the bonds until, &c.—provided, that nothing in this act shall, in any way, affect corporation rights for any contracts or subscriptions heretofore made with any railroad company or corporation, for the issuing of county corporation bonds." Now, when these decisions, and this legislation, are regarded, does any lawyer expect this Court to overturn all that has been done upon the faith in them, whatever our present individual opinions may be ? We believe not. With these remarks, we pass from the question of the power of counties to subscribe to the stock of railway companies, whose road is to pass through, or into the county.

The foregoing matters arise under the defendant's demurrer, to the the plaintiff's petition. The next questions arise under the plaintiff's demurrer to the defendant's answer. The Court sustained the demurrer, and the

defendant complains that this involves the decision that no submission of a question—no notice—no proposition, nor adoption of a tax—no entry nor publication of the result—was necessary. This is an error. The decision does not involve all this.

The Court may well have decided that the thirty days publication, was not necessary, in this case. This is manifest from Code, section 119.

It may also have decided, well, that the sixth cause under the fourth allegation of the defendant, to-wit: that no requisite of chapter 15 of Code was observed, was not sufficient, being too general.

As to the first four grounds under the defendant's fourth allegation, the Court below had a right to look into the whole record; and upon so doing, it found that the first, third and fourth grounds, were negatived in point of fact, by the defendant's allegations, of what the county records contained. In truth, this part of the cause is absorbed in that arising under the sixth and eighth allegations of the defendant.

The second ground under the defendant's fourth allegation, will be noticed hereafter in its bearing upon the plaintiff, as the endorsee, assignee, or holder of the bond and coupons. The next point is, that the recitals in the bond executed by the County Judge, are not conclusive on the county. This point appears to be abandoned by the counsel; and if not so, it cannot be maintained.

We come now, to matters presenting somewhat more of difficulty. The defendant pleads fraud and misrepresentation, and failure of consideration. The validity of these pleas, or of this part of the answer, depends upon the question of the negotiability of the bond and coupons. Whether the coupons have an existence independent of the bond, and could be assigned and sued upon separately, is not here made a question, but the bond is set forth and shown, and the relation of the interest warrants to it, is made manifest. The case will be considered, then, as if the warrants were entirely dependent upon their connec-

tion with the principal obligation, for no question is made upon this, and it is unnecessary to make one. If the paper is not negotiable, many defenses may be made against it, which cannot be, if it be negotiable; and this is true, both upon common law rule, and by section 949 of the Code. The principal obligation—the bond,—must be considered as a negotiable instrument. The term *negotiable* instrument, is here used. Some of the cases—and among them, some of those cited by counsel, and by the Court—seem to avoid the use of the word, "negotiable," and speak of such instruments as assignable, or transferable by endorsement, or by delivery. If an instrument is thus transferable, we know of no difference between that and negotiability, in effect, but if it be desired to save the word "negotiability," and appropriate it to mercantile paper, we have no objection; but for the purpose of this case, it is all the same, and we use the terms promiscuously. It may be that the incidents of days of grace, and notice, may not attach, but that is of no moment, at present.

To sustain the position that the bond in the present cause, (and, consequently, the coupons as dependent upon it,) is not negotiable nor assignable, in any sense or manner, so as to entitle the holder to assume the position, or the maker the defences, which pertain to the *bona fide* holder of negotiable paper, we are referred to the case of *Clark et al.* v. *the City of Janesville*, before the U. S. District Court for Wisconsin, now first reported in 4 American Law Reg. 591. In certain features, that case is singularly like the present one. It related to bonds of the town of Janesville, issued for subscription to the stock of a rail-way company. They were issued in 1853—payable in twenty years,—with semi-annual interest, payable in New York,—and the action was brought on certain coupons attached to the bond, for the semi-annual interest. The report does not state the pleadings, further than to say, that the declaration was in assumpsit on the common counts. The bonds, with the coupons attached, were offered in evidence. They were payable to the R. R. Company, or assigns, and purported to

Vol. V.                8

be assigned to (blank) or bearer, a space being left for the name of the assignee. The principal question, and the only one really judicially determined by the court, was upon its jurisdiction over the cause. But it did adjudicate upon some questions touching the qualities of the instruments. It held, that the coupons had no existence, independently of the bonds, and that the former derived their character from the latter. It also held, that the bonds were not negotiable; and for this, the court stands upon the ground, that they were specialties, being under the seal of the corporation, and that, "there is no statute authority in this State, for the assignment or transfer of a bond or specialty, whereby the assignee or holder may become the legal owner, and be enabled to sue in his own name." On these points, the law of Iowa is directly the reverse.

Reference is further made to *Overton* v. *Tyler*, 3 Barr, 346. This was a case of a promissory note, payable to A. or bearer, with which, in the body of the same writing, was a warrant of attorney to confess judgment. GIBSON, C. J. for the court, held it not to be a negotiable promissory note. Alluding to the brevity and pertinency of the terms of a note or bill, as usually drawn, he says: "A negotiable note or bill, is a courier, without luggage." Let us see what the learned Chief Justice regarded as *luggage*, embarrassing the transfer of the instrument. It was not only a promissory note, but also a power of attorney to enter judgment—even before due—releasing errors—waiving a stay of execution, and the appraisement of property. Upon this, he held that its negotiability was instantly liable to be merged in a judgment, as it was in fact merged when it had three months to run; that its separate existence was liable to be merged, and its circulation arrested, by being attached as an incumbrance to the maker's land; that the warrant of attorney would not pass by the indorsement; and that, altogether, the parties did not intend it as a negotiable instrument. Against the above case, stands that of *Osborne* v. *Hawly*, 19 Ohio, 130, in which it was held, that a power of attorney attached to a note, did not inter-

fere with its negotiability, but that the power itself would not pass.

Let us next inquire, what there is in or about the present obligation, (we look at the bond itself,) which serves to embarrass it—to render it a courier, *with* luggage. It pos_ sesses the principal qualities of a promissory note. It is simply a promise to pay—to pay money—to a certain person—absolutely—at a certain time, and it is payable to the payee or assigns. The coupons are payable to the holder. But it is true that these things do not constitute the sole criterion of negotiability, as is shown by the cases above cited. The present instrument, then, contains a simple and absolute promise to pay money, with all the certainty and definiteness of a promissory note. But there is more, it is said. What there is more, however, is mere verbiage, in effect, so far as it bears upon the present question. Besides the promise, it shows, the authority by which it was issued, and the purpose for which it was designed. The only effect of this, it is apprehended, is to put the purchaser upon inquiry as to that authority. Then there is a stipulation to pay the obligation in the stock of the company, if the holder should so elect. If this latter were at the option of the county, it might change the case; but, as the whole stands, it is a promise to pay money, with an election in the holder to take stock. There does not appear to be anything in this instrument, embarrassing its negotiability, unless it be the reference to the authority, and this is only a caution to the purchaser. There is nothing by which its separate existence can be merged, or its circula_ tion arrested. No particular form of words is necessary to make a negotiable promise—not even a promise in express words,—but there must be an undertaking to pay, and an intent of negotiability. For different forms, and as to what has been held to be a negotiable note, see 1 Am. L. Ca., 312, *et seq.* Nor is the seal an objection to its negotiability, as in past times it would have been, and may yet be in some States, for, with us, sealed instruments have ever been negotiable. That is, the seal is not an obstacle, since sealed promissory notes, payable to order or bearer, have,

in this State, always been negotiable. Besides this, sealed instruments, simply as such, are abolished with us. That is, the use of private seals, except by corporations, is abrogated. So that the use of one, in such an instance as the present, is but the mode of expression by a corporation, and that a public one. The technical idea of a specialty did not exist among us, at the time this instrument was made. But the intent of the parties, supposed or inferred, has often had weight, and this leads us to section 950 of the Code. The case does not need to be placed upon this section, but it is worthy of note, whilst considering the intention. This section provides, that instruments which are not usually negotiable, may be made so, with all the incidents of negotiability, whenever it is manifest from their terms, that such was the intent of the maker; but the use of the technical words "order" or "bearer" alone, will not manifest such intent.— This instrument is payable to the company or its assigns, but this alone is not sufficient to show the intent of negotiability. Then, farther, the bond is payable at a bank in the great commercial centre of the country—it is issued "*in part payment* of a subscription of five hundred shares of stock," as appears on its face,—and in the final order and record is the following: "And it is further considered that the county judge make arrangements to secure the expenditure of the means raised, by the sale of said bonds, within the limits of Cedar County." Then, it appears, that this and its fellow bonds, were issued in payment of subscription to the stock of a rail-way, and they were expected to be sold in the market of the world, and were made payable in the commercial emporium of the country. They both are, and were intended to be, negotiable instruments.

In the support of these views, we desire to call attention to the case of *The Morris Canal and Bank Co.* v. *Fisher*, 1 Stockton, 667. The length of this opinion forbids some quotations which would be pertinent, but it may be remarked, that that case is even stronger than the present one, and fully considers the question of negotiability and of defenses against, a *bona fide* holder. See also *Delafield* v.

*State of Illinois*, 8 Paige, 533, and S. C. 2, Hill, 177; *Wookey* v. *Pole*, 4 B. & Adol. 1; *Georgia* v. *Merville*, 3 B. & C. 45; *Lang* v. *Smith*, 7 Bing. 284; 1 Par. on Con. 240.

The fourth allegation and defense of the defendant, is that the bond was not issued under authority of law, by reason of the non-compliance with the law in several particulars, as set forth in the pleading, numbered four in the statement. The demurrer of the plaintiff extends to this, and were this the only pleading relating to those matters, it would be fatal to that demurrer, for although the obligation is a negotiable instrument, yet, if it were issued without authority of law, the plaintiff could not recover. This point differs from the matter of the inducement, representations or considerations leading to the issuing of the obligation. It is a paper executed by a public officer, in behalf of the public, (of a county,) and there must be authority for it to stand upon. But under a demurrer, the Court looks to all the pleadings, and we find that the defendant sets forth, at large, the record of the county upon the issuing of these bonds and coupons. If this record shows enough upon the matter of authority, to justify the purchaser in taking the bond, he cannot be held to go behind it, and show that the record is true. The case of *The State ex rel. Leach* v. *Bissell*, 4 G. Greene, 328, was brought to this Court for the particular purpose of testing the regularity and legality of the proceedings which led to the issuing of those bonds. It was instituted by the tax payers of that county, who were not in favor of the county taking stock in the proposed railway company. The points made in the case, relating solely to the proceedings, and to test these being the object of the action, the judgment settled those questions. The opinion takes special notice of the objections made on the form and manner of the vote, and on the supposed ground that the road must be constructed before the bonds could issue. It is not a matter of much consequence, whether that decision can, strictly, be pleaded in the present cause. It is sufficient, that it naturally

and necessarily, has weight as a decision of this Court, upon the very subject now under consideration. It related to this very vote—to the issuing of this, and these very bonds.

The record of the proceedings in relation to this subscription, is very awkwardly drafted and ungrammatically composed; but it contains the substantial matter: the proposition to subscribe to the stock of the company—the issuing of bonds—the tax to meet the payments—the form or manner of the vote—and the order that it be voted upon at the then next regular election, in April. This was ordered and entered, on or about the first of March, 1853. Afterward, on the second of May, there is an entry referring sufficiently clearly to this proposition, and declaring that a majority of the votes were in favor of adopting the proposition, and then follows the requisite order, to declare the result and to carry it into effect.

The objections made to this record are the following: 1. That it does not appear that the requisite notice was given prior to the election. We are looking at it from the position of the purchaser of the negotiable paper of the county. He finds a regular proposition ordered to be submitted to the people. It is no objection, of weight, that the record of the submission of the proposition, was made before the election, and that of the result, after it. After the election, he finds a record that a vote was taken, and that it was in favor of the subscription. Standing as he does, he has a right to presume the notice from this record. The record and the proceedings of the County Judge imply it. 2. Again: the proposition submitted contained the clause—"said amount to be expended only in the event of said railroad being constructed, and running centrally through the said county." The defendant now claims, that the final construction of the road, was to be a condition precedent to the issuance of the bond. But, in the first place, the expression is ambiguous, and admits of a strong doubt whether the word "constructed," does not belong to the word "centrally," as the word "running"

does, meaning "constructed, and running centrally," &c. In the next place, the County Judge has, by his acts, put a construction on this ambiguity; and we are inclined to think, that the purchaser of the paper has a right to take the construction of the authorized, official and legal agent; and that, if the bond is found to be issued, he is warranted in presuming the road to be built, to the acceptance of the county. 3. It is farther objected, that it does not appear from the record, that the county did subscribe fifty thousand dollars, (or any sum,) to the capital stock of the road. Of course, this could not appear by the county record, and this point is a fair illustration of the proposition, that such purchaser may and must presume certain things, from the fact that the bonds are issued. Of the existence of such facts, the county—or in other words, its authorized official, —is the sole judge, for these facts cannot appear of record. In other words, the purchaser of the bond is not bound to look beyond the records.

In connection with this part of the case, a good deal has been said about the County Judge being an agent—the agent of the county. And on one side, he is called a special agent, and much argument has been drawn from this relation. The analogy between this officer and an agent, will hold good but a little way. It does not hold good in any valuable sense. It is true that the statute, in creating him, styles him the general agent of the county. But this is not to institute this relation properly. It was to declare him to be the general, rather than the special, agent. At the best, he is but a *quasi* agent. Properly speaking, he has no principal, and so far as he has, this principal only appoints him, and has no farther power over him. He does not derive his powers from the county, but from the law, and the county cannot revoke them. It cannot act itself, in any case. He is the head, and hand, of the county. In short, he is an officer of the law, deriving his powers from the law, and governed by it. He keeps a record, and these proceedings are to be recorded; and this record, at least in such a transaction, and as to

the county, is a verity. His acts, therefore, cannot be construed by the laws of agency, but we must· regard him as just what he is in the law. And in this view, although his powers are limited by the law, yet he is a public officer, keeping a record; and this plaintiff had a right to take that record, as against him and the county, to be true, in its statements, and in its necessary implications and presumptions, and the officer is answerable to the law for his wrong or erroneous acts, if he has carried them into the record. We do not undertake to define how far these views would be correct, when applied to other subject matters, or to parties holding other relations to the county. We are considering only the case before us. Neither do we mean to touch the hypothetical case of a County Judge, making a record of similar proceedings, when in fact, *no such proceedings had taken place*—that is, where the record was false *in toto*, having no foundation in fact. But these remarks apply to a case where the question relates only to the regularity of proceedings which, as a whole, have in truth taken place.

The fifth ground of defense.is, that the said company never had possession of the bond, nor was it ever delivered to said company, but on· the contrary thereof, certain persons, to-wit: Adams, Haun, and McCoy, and others unknown, pretending to represent said company, conspired together, and by fraud, misrepresentation and deceit, unlawfully got possession of said bond, and afterward fraudulently, and without authority of law, or of the company, pretended to assign the same to the said Adams. The demurrant says, that this part of the answer is bad, in law, for · not setting forth and showing the fraud and the misrepresentations. There is so much of legal duplicity, or else of ambiguity, in this plea, that it is difficult to determine on a satisfactory view to take of it. Whether its burden lies in the fraud, or in those persons not representing the company, in fact, or whether it is in the pretence of an assignment, or in the manner of getting possession, is uncertain. There are several facts embraced in it, but

Clapp v. The County of Cedar.

none distinctly made a point; and if the matter of the possession, is the gist, then does it mean that possession was never delivered, but that it was surreptitiously obtained, or is it that the delivery of possession, was obtained by fraud, &c.? Portions of the language favor either view. Now, if possession was never delivered to or for the company, then it is not the deed of the county, and it can plead *non est factum*. But if possession was delivered to or for the company, although it were caused or procured by fraud, this would not constitute a defense against the innocent indorsee. Taking the whole of the plea, or of this part of the answer, together, and regarding the manner in which it is_ treated in the arguments, and the.view which it seems probable must have been taken of it in the court below, we conclude that the meaning of the plea is, that whilst possession was delivered for the company, yet it was obtained through fraud and misrepresentation. This view is confirmed by other parts of the pleadings, which aver that the officer did deliver the bond, and state circumstances attending it. Assuming this to be the meaning of the pleading, such a defense would not probably be of avail against an indorsee, without notice. At least, these doubts and difficulties, exemplify the necessity of setting forth the fraud and misrepresentation. It neither does this, nor does it make an issue on any of the facts suggested. The word " pretended" is too loose in its signification.

The sixth defense is, that the bond and coupons were obtained from the county by fraud and misrepresentation, and without consideration. This pleading is guilty of the same kind of ambiguity with the preceding, and it is, in fact, doubtful whether its gist lies in the assumption of an authority by the agents, which they did not possess, or in the representation of an intention in the company, which did not, in fact, exist. But the prominent thought is probably sufficiently apparent. As the defense just noticed, related to the obtaining *possession* of the bond, so the present one aims at the representations made, and the induce-

ments held out, for the issuing of the bonds. Thus, the plea is, that the county was induced to subscribe, and issue its bonds, by the promise of a rail way running through her territory, whilst, in truth, the company did not intend to construct such road. It is entirely manifest, that if the obligation is negotiable, this defense is not available against an indorsee, unless notice is charged and proved upon him. It goes to the original inducement and motive for giving the bond, and with this, the purchaser has nothing to do. It is not a matter which would sustain the plea of *non est factum*, or *non assumpsit*. The innocent holder has no more to do with it, than with a false warranty, or a failure of title, for which a note may be given.

The defendant claims, that if he sustains the averments in his pleading, by proof, it will, at least throw upon the plaintiff, the burden of showing that he obtained the bond *bona fide*, or gave value for it. He cites, and relies upon the remarks made in Liv. Law Mag., January, 1856, 96, and the English cases there cited, of *Bailey* v. *Bidwell*, 13 M. & W., 73, and *Fitch* v. *Jones*, 32 Eng. Law and Eq. 134. That such a rule of law has been recognized, both in England and in this country, cannot be doubted. See the above cases, and other cases cited by counsel; Story on Bills, sections 185 to 144; *Uther* v. *Rich*, 10 Adol & Ellis, 784, S. C. 37 E. C. L. R. 235; *Holmes* v. *Karsper*, 5 Binn. 469; *Vallett* v. *Parker*, 6 Wend. 6, 15; *Munroe* v. *Cooper*, 5, Pick. 412; *Knight* v. *Pugh*, 4 Watts & S. 445; *Woodhall* v. *Holmes*, 10 Johns. 231; *Rodgers* v. *Morton*, 12 Wend. 484. But, in order to throw this burden upon the plaintiff, it is equally clear, that the defendant must both allege and show, either that the plaintiff took the paper after due, or that he had notice, or that he gave no value. It is true that in *Fitch* v. *Jones*, *ut supra*, Lord Campbell said that though the defendant was to prove one of these things, yet he held that he did prove it *prima facie*, by showing the illegality; and in *Bailey* v. *Bidwell*, 13 M. & W. 73, it was held, that if it were proved

that the instrument was obtained by fraud, or affected by illegality, that would raise. a presumption which would cast the burden upon the plainiff. Thus, it appears, that the defendant's argument is erroneous, when he says that it is not necessary to allege this matter, because he would not have to prove it; for the same cases on which he relies, base their reasoning upon the ground that the matter *is* proved *prima facie*. *Kelley* v. *Ford*, 4 Iowa, 140. Some of the cases, it is true, do not state, in terms, that the matter must be alleged, but assume that it is so stated. But it is understood to be the doctrine, that the defendant must aver some of these things. It is expressly so stated in *Bailey* v. *Bidwell*, and in *Fitch* v. *Jones*; and in *Uther* v. *Rich*, Lord Denman, in his opinion, puts that allegation of the plea in italics, so as to give it emphasis, and says: "We are of opinion, that the only proper mode of implicating the plaintiff in the alleged fraud, by pleading, is to aver *that he had notice of it.*

Now, in the defendant's fifth and sixth grounds of defense, he makes no such averment against Clapp, the holder and plaintiff, but he singularly stops short with Adams, in all this class of allegations. The defendant in a part of his answer, separately and distinctly from those allegations, concerning the obtaining the possession, and the issuing of the bond by fraud and misrepresentations, makes an independent averment, that the plaintiff is not a *bona fide* holder, but does not state why or how. That this is not sufficient, see the three cases last above named. That a mere want or failure of consideration, is not sufficient to raise the presumption, and throw the burden, above spoken of, upon the plaintiff, see the same cases.

The seventh plea or defense contained in the amended answer of defendant, is in substance but a repetition of a portion of his first answer, and is but a denial of the assignment of the bond, and of the authority of Haun and McCoy, to make such assignment. It presents some of the few facts which were ultimately submitted and tried, and on which a verdict was rendered.

The eighth and last ground of defense, sets forth the county records upon the county vote, to which the plaintiff demurred. The purchaser of the bond was not obliged to look behind these records, nor was he bound to look to it, that they were true. It is true, as urged by defendant's counsel, that he was to see to it that the bond was issued under authority of law, but when he finds that the records show sufficient for this, he is justified in purchasing. On this point, we refer to the remarks made under the fifth defense.

From the views above expressed, it will be perceived, that the court below did not necessarily decide several points of law in the manner supposed by the defendant, in his assignment of errors, when it overruled the one and sustained the other demurrer. And it will be farther perceived, that the subsequent event of the rail-way company becoming insolvent, and being dissolved, has no bearing on the plaintiff as a purchaser, and holder of the county bond and coupons.

. We believe that all the questions raised for adjudication have been touched upon. Some of them would well admit of a wider range of discussion, but they are so numerous, that they have extended this case to a degree which compels us to content ourselves with a brief consideration of some, and even with a summary disposition of a portion of them.

The judgment of the District Court is affirmed.

WRIGHT, C. J., *Dissenting.*—I do not wish to be understood as concurring in one point determined in the foregoing opinion. I allude to the power of the county to issue these bonds. While we unite in entertaining very great doubts, whether the power exists, yet in view of the peculiar and vital character of the question involved— the possible, not to say probable, various consequences to the credit of the State, to result from a change—and the fact that the holders of these bonds, within and without the State, have in good faith relied upon the decisions

Clapp. v. The County of Cedar.

made by our predecessors, it is thought best by my brother Judges, to adhere to such former rulings.   I admit at once the great force of this argument, and appreciate, as I trust very fully, its weight and propriety.   And so strongly inclined am I to leave undisturbed such questions, when once determined, and so much have I been impressed by the reasons which influence the opinion of the majority of the Court, that I confess it is with great hesitation, that I have finally felt constrained to withhold my assent.   My convictions are, however, so strong, firm and decided—the argument which denies the right of the counties to issue these bonds, is to my mind, so clear and conclusive—that I am compelled, though very reluctantly, to say, that I cannot follow such former adjudications.   It is no part of my present purpose to enter upon this argument.   I only desire, at this time, when I am just called upon to express an opinion upon this question, as a member of this Court, to say, that I am very clear that no such power was conferred upon the counties by any provisions of the Code. I am equally clear that a majority of the voters of a county have no inherent power, to determine that the entire population shall be taxed for the purposes contemplated by the vote in this instance.   Nor judicially, am I ready to admit, that under our constitution, the legislature can confer such power.   And believing that any former decision of this Court recognizing this right, either as an inherent power, or one conferred by positive law, is wrong—radically wrong—I cannot give it my approval, even by an unwilling acquiescence.   More than this, I deem it unnecessary to say at this time.

NOTE BY THE REPORTER.—At the time the opinion in *Clapp* v. *The County of Cedar*, was prepared, as will be evident from the opinion itself, the fourth volume of Judge GREENE had not been published, and the Court did not have access to the opinion of the Court, in *Dubuque County* v. *The Dubuque and Pacific Railroad Company*.   Since the opinion in the first named case was filed, Judge GREENE's fourth volume has been published; and in preparing *Clapp* v. *The County of Cedar* for publication, the Reporter deemed it proper, for the convenience of the Court and bar to cite *Dubuque County* v. *The Dubuque and Pacific Railroad Company*, as published in 4 G. Greene, in the opinion.   With this explanation, the bar will understand the references in the opinion, to the Dubuque County case.