## STATE OF IOWA,

IOWA CITY, JUNE TERM, A. D., 1853,

In the seventh year of the State.

---

PRESENT :

HON. JOSEPH WILLIAMS, *Chief Justice.*
" JOHN F. KINNEY, } *Judges.*
" GEO. GREENE,

---

DUBUQUE CO. *v.* DUBUQUE AND PACIFIC RAILROAD COMPANY.

A county has the constitutional right to aid in building a railroad within its limits.

The proceedings under which the citizens of Dubuque county voted two hundred thousand dollars to aid in constructing the Dubuque and Pacific railroad through that county, were regular, and authorized by law.

Section 114 of the Code applicable to railroads.

### *Appeal from Dubuque District Court.*

*Opinion by* GREENE, J. This case was taken from the county court of Dubuque county to the district court, and the following points were submitted for adjudication :

1. The constitutional right of the county to assist in the construction of a railroad within its limits.

2. The regularity and legality of the proceedings under which the citizens of Dubuque county voted the credit of the county to the amount of two hundred thousand dollars

VOL. IV.——2

to assist in building the Dubuque and Pacific Railroad through that county.

3. Whether the Code of Iowa authorizes such proceedings and subscriptions.

These points were decided in the affirmative, and thereupon the prosecuting attorney took an appeal to this court, and claims that the court below should have decided each point in the negative.

1. The constitutionality of such a vote is to be considered. As the objection to such votes has been so gravely raised and seriously urged, it has been supposed by many that our state constitution, either in express terms or by strong implication, deprives the citizens of all power to vote the credit or money of their county to any railroad or other improvement within the county limits. But the constitution does not make the slightest allusion to any such restriction, and the only clause to which we are referred in this connection is that which defines the legislative department (art. 3,) and under this we are admonished that the general assembly cannot confer upon the people the power to legislate : *Delegare non delegatum est.* But what has that maxim to do with the constitutional right of the people to vote for or against an appropriation of their money, or a tax upon their property, for a specific object, recognized and regulated by laws already enacted? Such a vote involves no act that has the slightest approximation towards legislation. It neither creates nor repeals any law. It leaves the statutes in all respects just as it found them. It is merely an expression of popular sentiment, under which the county judge is authorized to do or not to do a certain thing in the manner defined by law. As the people have not in the constitution delegated this power to vote upon such propositions, nor in any way conceded or divested themselves of the right, but have in express terms affirmed in the bill of rights that " all political power is inherent in the people,"—art. 1, § 2,—we conclude that the people may with constitutional propriety

Dubuque Co. *v.* Dubuque and Pacific Railroad Company.

vote the credit of their county to aid in the construction of a railroad within its limits.

But it is said that the constitution limits the state indebtedness to one hundred thousand dollars, and that therefore all the counties in the state cannot contract or create a greater debt in the aggregate, than the general assembly might create. That such county indebtedness would be a debt within the state to be provided for by taxation, and thus liabilities would be created which are repugnant to the constitution. It is also argued that as " the state cannot directly or indirectly become a stockholder in any corporation," so .counties cannot become stockholders without indirectly making the state a stockholder. Under such logic, individuality is blended into mad confusion. A county is magnified into a state, and no distinction recognized. If those state restrictions are applicable to counties, they must be equally applicable to the cities, and citizens of the state. It may, with equal propriety, be said that the citizens of Iowa cannot in the aggregate contract debts exceeding one hundred thousand dollars, and that no citizen can become a stockholder in any corporation. There is quite as much identity and affinity between a citizen and the state, as there is between a county and the state. But no one will contend that a constitutional restriction upon the state government is also a restriction upon a citizen of the state ; how then can it be claimed that such a state restriction should be enforced against a county? Such a construction would be latitudinarian in the extreme.

2. We are next to consider whether the proceedings in this case, under which the vote was given, were regularly conducted. It appears that a petition, signed by a large .portion of the citizens of Dubuque county requesting that the question might be submitted to a vote of the people, whether the county should assist in the construction of the Dubuque and Pacific Railroad, was submitted to the county judge ; and the facts were established before him that the first division of the road for which aid was re-

quested was located entirely within the county limits ; that the proceeds of the bonds to be issued under the proposed vote would be used exclusively on such division of the road within the county ; that said road was as necessary for the convenience of the people as any other road previously constructed in the county; that the business of the county required increased traveling facilities, as the roads already open were inadequate, and at seasons of the year almost impassable ; that the construction of the road contemplated, "became in the opinion of the court indispensable to the well being of the county ;" and that as it would require an extraordinary expenditure far beyond the available means of the county, to construct such a road, it was in the opinion of the court advisable to aid a private corporation in the construction of said road, and thereupon the proclamation was issued and the question submitted to the voters of the county. The proclamation and all the papers in the case appear to have been prepared with care and accuracy ; and the proceedings appear to have been conducted with especial reference to the Code under which they were authorized. But,

3. It is contended that the proceedings are not authorized by the Code. Section 114 provides that "the county judge may submit to the people of his county at any regular election, or at a special one called for that purpose, the question whether money may be borrowed to aid in the erection of public builings ; whether the county will construct or aid to construct *any road* or bridge which may call for an extraordinary expenditure." An effort is made to restrict the meaning of the words "*any* road" to common roads, streets and lanes. We can see no good reason for such limitation upon the ordinary use of words. The word "*any*" extends to an indefinite number of roads. It applies to all, and to all kinds, which may require an extraordinary expenditure. An ordinary highway or road requires no such expenditure. Such roads and highways are abundantly provided for by the general road tax upon

Dubuque Co. *v.* Dubuque and Pacific Railroad Company.

persons and property. Code, §§ 567, 568, 569. Under these three sections an ample fund is provided, which may be increased to any extent by a vote of the people; and a special property tax is also provided for the building of bridges which may be found too expensive for the ordinary road fund.

In the construction of a statute the great object should be to discover the true intention of the legislature. The language of section 114 is precise and free from ambiguity; consequently no more can be necessary than to apply to the words their natural and ordinary sense. But if any doubt is entertained in relation to the real meaning of the legislature, that doubt must be removed when that section is considered in connection with the other sections of the Code to which we have referred. These sections were prepared by the same commissioners and adopted by the same legislature; the one under the law defining the powers and duties of county judge—the three sections under the law regulating roads and highways. The latter law is complete within itself. It comprises all necessary legislation upon the subject, and provides all necessary means for the construction of common highways or public roads. The former law in section 114 confers the power upon the county judges to submit to the people the question whether their county shall construct or aid to construct any other road or bridge requiring an extraordinary expenditure. All common roads and bridges, even such as involve large expenditures, are abundantly provided for by chapter 38 of the Code. Section 568 provides that a property tax of three mills on the dollar may be levied, and a higher rate, without limit, may be established by a vote of the people. As all public roads are abundantly provided for without the aid contemplated in section 114, we can see no reason why the provisions of that section should be regarded as applicable to such roads. The legislature clearly did not intend this section for public or county roads, not only because the same provisions and

means were fully provided for such roads in other sections, but also from the fact that such roads are not under the control of any other being or association. The section provides for "aid to construct," thus referring to such roads as are controlled and managed by other corporations or parties than the county.

Under every rule of construction applicable to this section, whether we take the words themselves in their natural and ordinary sense as the best declaration of the lawgiver's intention ; or whether we consider this section in connection with others so as to impart force and harmony to the whole ; or whether according to the condition and wants of the county which dictated the policy of the act, the conclusion is fully confirmed in our mind, that the provisions of section 114 are applicable to railroads, and that the court below ruled correctly.

Judgment affirmed.

*Dissenting Opinion by* KINNEY, J. William Y. Lovell, as county judge for the county of Dubuque, issued his proclamation to the voters of that county, ordering an election to be held, and a vote to be taken upon the following proposition :

" Shall the county of Dubuque assist in building the Dubuque and Pacific railroad, commencing in the city of Dubuque, by taking two hundred thousand dollars stock, for which county bonds will be issued, and an annual tax of five mills on the dollar be levied for the payment of the interest on said bonds, and that after fifteen years that the amount of the tax be increased to the sum of one per cent. on the taxable property of the county, for the purpose of paying the principal and interest of said bonds, until the said bonds and interest be all paid ; provided, that it shall be in the power of the county judge to reduce the tax each year, in case the said per cent. should raise more than the amount of principal and interest due in each year, but in no case can the per cent. collected be

Dubuque Co. v. Dubuque and Pacific Railroad Company.

less than sufficient to meet such principal and interest, and provided that should the county judge, at any time deem. it for the interest of the county to dispose of its stock at par value, then the above tax to cease from and after the sale. The form of the vote shall be "for the railroad," or "against the railroad." "For the railroad" shall be for the above proposition entire." From this decision of the county court submitting the above proposition, the county by David S. Wilson, Esq., appealed. When the case came into the district court, it was submitted by consent of counsel on the following points: *First*—Whether the county has the constitutional right to assist in the construction of such a railroad within the bounds of the county. *Second*—Whether if such constitutional right exists, the proceedings of said case were regular and in accordance with the Code of Iowa. *Third*—Whether the Code of Iowa authorizes such proceedings and subscription.

After full consideration of the case, the court decided the above proposition in the affirmative, and declared the proceedings of the county court legal and valid. Whereupon the case was appealed to this court, and the following errors are assigned. *First*—The judgment of the district court is against law. *Second*—The exercise of the power of voting a tax for the purpose of subscribing to a railroad company is unconstitutional, illegal and void. *Third*—The code of Iowa confers no power upon the county judge of Dubuque county to submit the question of taking stock by the county in a railroad to a popular vote.

These assignments embraced substantially the propositions submitted to the district court, and by that court decided in the affirmative.

By a majority decision of this court, that judgment is affirmed: from this decision I must respectfully dissent; and will examine the propositions submitted to, and decided by the court below and this court.

Can the legislature constitutionally pass a law author-

Dubuque Co. v. Dubuque and Pacific Railroad Company.

izing the counties to vote a tax for the purpose of con
structing railroads, and have a majority of the electors
the right by their votes to tax a minority against their
consent? It is claimed that there is such a law: this I
deny, and will in the proper place establish, my position·
But first as to the constitutional question here presented.
Taxation is an arbitrary power. It is a high prerogative.
It is an element of sovereignty. It can only be levied by
express law or the will of the monarch. It is based upon
public necessity, and proceeds upon the ground that it is
essential to the public welfare and safety. It should only
be resorted to when required for this purpose. Unless
confined within its legitimate sphere, it will become des-
potic and subversive of those liberties which it was
ordained to protect. It is insidious, and demands con-
stant watching, or under the assumed name of public
good, general prosperity, &c., it will invade and destroy
the rights of the people. It is that power which the
mother country attempted to exercise over the infant colo-
nies, and which met with such a signal rebuke from the
stern men of those days, who taught the world that they
knew well how to discriminate between the rightful and
oppressive exercise of this power; and it well becomes our
government to prevent its exercise for any other purposes
than support, defense and security. It is a rule necessary
to the existence of society that many of our natural rights
must be surrendered for the public good. In exchange
for these we obtain protection to life and liberty, secu-
rity in acquiring, possessing and enjoying property.

Members of this society are bound to contribute their
proportion of the expense in sustaining an organization
which affords these great blessings. For the great object
of protection, national, state, county and city organizations
are established. With a wise national constitution, clearly
defining the rights of the several states, and planting im-
portant landmarks in the cause of civil and religious
liberty, with our state constitution embracing principles

Dubuque Co. *v.* Dubuque and Pacific Railroad Company.

applicable to the situation, and promotive of the happiness of the people : these constitute the foundation of organized society, and here has the citizen a right to look, to ascertain the extent of the rights yielded and acquired by his membership. Here he finds that the object of government is to take from him only such natural rights as are inconsistent with the enjoyment of civil liberty, and to demand by way of taxation only so much as is necessary for the support of that government. He also finds in the state constitution a power delegated to the legislature to create political and municipal corporations : hence counties and cities are organized for the sole purpose of rendering the enjoyments of life, liberty and property more perfect and complete. Now as a member of the government what taxes is he compelled to pay? He must assist in the support of the national and state governments, because these make and execute the laws which afford protection. He must bear his share in the necessary county expenses, because this organization is but a refined branch of the government, placing life, liberty and property upon a more secure and permanent basis, and bringing protection more perfectly within his reach. This then is the object of government, and its support, the only cause for which the citizen can legitimately be taxed. But it is said that a majority must rule, and a man as a member of the county organization is subject to the rule of the majority. This in many respects is true, but it is liable to very many exceptions. If a majority say that a man shall suffer death, is it any reason why that punishment should be inflicted ? If a majority say that he shall be imprisoned in the penitentiary, is it any argument in favor of a deprivation of liberty? If a majority say that a man's property shall be taken from him and given to another, does this afford a reason for stripping him of his possessions? Not at all; and yet we are told that a majority can tax a minority against their consent for purposes entirely foreign to the support of

2*

government; and if they refuse to pay such tax, lay hold of, and sell their property, and appropriate the proceeds in building railroads. Was this a part of the object of the political association? Was there any express or tacit stipulation on the part of the corporators, when they formed this compact for self-protection, that their property might be taken from them by order of a majority for purposes of private enterprise and speculation? Is there anything to be found in the law organizing these counties from which such a power can be inferred? Is it not a well established principle that no powers can be exercised except those expressly granted? Is it not true that a corporation can only be used to carry out and fulfill the object of its creation? Can it be said when counties were organized solely from public necessity, and to render the rights of the citizen more secure, that they are fulfilling these objects by building railroads, and that these are essential to the public good?

In my opinion a person is not subject to this kind of involuntary taxation. It does not contribute in any way to support the government, nor is it promotive of that welfare and security for which governments were established. To allow a majority by their vote to tax a minority, to build railroads, is repugnant to every principle of civil liberty, and tends directly to despotism. If this doctrine is to obtain, then it is in the power of a bare majority of voters, destitute of property, to saddle a tax upon a minority, the only property holders in the county. How is this power to be kept within reasonable limits? and who is to draw the dividing line between a tax for support and protection, and that which may be said to be for the public good, unless the tax be confined to the legitimate purposes of government? If it may be raised to build railroads, it may with the same propriety be raised to erect manufacturing establishments, to sustain a line of steamboats, keep up a line of stages or telegraphic communication. All of these, in one sense, are quite as necessary to the public

Dubuque Co. *v.* Dubuque and Pacific Railroad Company.

good and convenience as railroads ; and yet who will contend that they can be established and kept in operation by a compulsatory tax vote? And yet such is the inevitable result if the decision of this court is to become the law of the land.

The constitution declares "that all men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property." If this property is to be held by the citizen, subject to the will of the majority, and if by that majority it can be taxed, sold, and appropriated towards building works of internal improvement, where is the enjoyment, possession and protection guarantied by this article of the constitution? Is a man protected in the possession of his property when public clamor may at any time demand it for what a majority may please to call public purposes? Do the people of Iowa hold their land by so feeble a tenure?

But it is said that when private rights come in contact with the rights of the many that the former must yield. This is true when necessary for the purposes of government, or for those public conveniences which are free and accessible to all. It is upon this principle that taxes are levied and property sold to support the government. Upon this principle are public roads laid through our lands, over which the public have a right to pass without loss or hindrance. But as railroads are in no manner connected with the successful administration of government, and as they are mainly owned and controlled by private companies, the benefits of which can only be enjoyed upon such conditions and charges as the corporators may impose, it follows that they do not fall within the principles here laid down, and that private rights should not yield although demanded by a majority. By a wise provision in our constitution the state indebtedness is restricted to the sum of one hundred thousand dollars, unless a proposition for a greater amount be first submitted to the people at a general election and re-

ceive the approbation of a majority of the qualified electors of the state. This restrictive clause was intended for the purpose of preventing the legislature, in times of great public excitement, from involving the people in those heavy embarrassments for works of internal improvement which had proved ruinous to many of the western states. And yet, while no general election has ever been held for the purpose of deciding this question, the electors of the counties have at special elections voted themselves in debt for railroad purposes more than three millions of dollars. While the force of this provision in the constitution is admitted, it is contended that all the counties of this state may at special elections vote themselves in debt to any amount. In my opinion this would be doing indirectly what the constitution directly forbids. The counties make up the state, and the people, who are obliged to bear the burden of the taxation, are protected by the constitution from such excessive indebtedness, except in the manner pointed out by that instrument. Here may the minority shelter themselves against the taxation sought to be imposed by virtue of special elections.

But again, " the state shall not directly or indirectly become a stock holder in any corporation." § 2, art. 8. It is admitted that the counties voting in favor of a certain amount for railroad purposes, become stockholders to the amount voted for. If it is admitted that one county can become a stockholder in works of internal improvement, it follows as a necessary corollary that every county in this state may do the same. Suppose such should be the result, which appears rather probable from present indications, I ask if the state is not indirectly a stockholder and the spirit of the constitution as clearly violated, as if the state should do directly that which the constitution forbids? It is the duty of the courts to protect and preserve the spirit of the constitution from legislative encroachment, otherwise that solemn instrument which was formed to protect the life, liberty and prosperity of

the citizen, (every principle of which the court should enforce) would be liable to be frittered away, and become a mere rope of sand.

But I have thus far treated the subject as though there was an express law authorizing counties to vote for, and take stock in works of internal improvement. I affirm that not a single adjudged case can be found sustaining corporation tax for this purpose, that has not proceeded upon the ground that there was a clear and unmistakable law authorizing the raising of such a tax. The court below and a majority of this court decided that this law is found in the Code of Iowa. It will be borne in mind that the legislature appointed three commissioners to prepare and report to that body a code of laws, this report they presented at the session commencing in December, 1850. It is claimed that this law exists in § 114 of the Code. That section when reported to the legislature read as follows:

"The county judge may submit to the people of his county at any regular election, or at a special one called for that purpose, the question—whether money may be borrowed to aid the erection of public buildings—whether the county will construct or aid to construct any road or bridge which may call for an extraordinary expenditure,— *whether the county will subscribe to any work of internal improvement.*"

This last clause authorizing the county judge to submit to the people of the county whether they would subscribe to any work of internal improvement, was rejected by the legislature on the ground that it was a violation of the constitution. Hence the clause was stricken out and the other part of the section adopted *verbatim.* See printed Code as reported, p. 6, § 12 ; also see as passed p. 23, § 114.

The question whether such power should be conferred upon the counties thus came directly before the legislature, and after full and extended discussion was rejected as

unconstitutional and unwise. But it is said that the authority is found in the same section in these words : " Whether the county will construct or aid to construct any road or bridge which may call for an extraordinary expenditure." These words " any road " undoubtedly mean any county road. It is plain to my mind that they do not mean railroad. The persons who drafted the section did not intend to give them any such meaning, or why did they in the very next sentence name works of internal improvement? It is apparent that the legislature did not so construe them, for they refused to pass that part of the section which gave counties the right to subscribe for railroad stock. It is well known to all who are familiar with the proceedings of the legislature of 1850–51, that the body was divided upon this question, one part contending that the counties should be permitted to engage in works of internal improvement, while the other and far more numerous party doubted the constitutionality and policy of such a law. It is also well known that the battle upon this subject was fought over the section of the Code which was stricken out. It was not claimed that the power existed except by virtue of the express provision which the legislature refused to pass. But I hold that the common acceptation of the word " road " will not justify its application to a railroad. As a generic term the word includes highways, streets and lanes, but is generally applied to highways. The words " any road" do not to my mind embrace railroads. When we speak of railroads we use the words, and it takes the adjective and the noun to convey our meaning. A railroad is in no legal sense a public highway or common road. But the Code has laid down certain rules by which words shall be construed. " Words and phrases shall be construed according to the context and approved usage of the language."—§ 26, p. 6. The manner here laid down for the construction of words in the Code is the law, and by it we are bound. All must agree that the word " road," by the approved usage of the

Dubuque Co. *v.* Dubuque and Pacific Railroad Company.

language, means a public highway, in which all have an equal and common interest. A railroad certainly is not such a road as this, as it is owned by private individuals, and is in all respects private property, subject to execution and sale, and to be laid waste and abandoned at any time. But we are not left to depend upon the definition and common acceptation of the word "road." The legislature has given a legal construction to the word which excludes the possibility of its application to a railroad : "The words 'highway' and 'road' include public bridges, and may be held equivalent to the words county road, common road, and state road." To prevent any misapplication of these words, "any road," and as if to bar the very construction which is now claimed for them, the legislature in clear and positive language confine their application to county roads, state roads, &c. Then it inevitably follows that the county judge cannot submit the question whether counties will subscribe stock to railroads, as no such power lurks under the words "any road." The definition given to these words by the legislature not only upsets such presumption, but it is evident that the friends of county stock never claimed for them such application, as an unsuccessful effort was made before the succeeding and last legislature to obtain a law for the purpose of enabling counties to assist in building railroads. See house journal, p. 218. Therefore, twice, by express vote, the legislature refused to allow the judge the power which it is now claimed was conferred upon him by the Code as it was originally passed. It never was contended, however, that the county judge had any such authority until it was ascertained that a law for this purpose could not be passed.

In this opinion I have established to my satisfaction : *First*—That a majority have no inherent or political right to vote a tax subjecting the property of a minority to be seized, sold, and the proceeds appropriated towards building works of internal improvement. That private property is not subject to this kind of depredation, and proceedings

for this purpose are in violation of natural rights, and inconsistent with the genius and policy of our government. *Second*—That the legislature has no right under our constitution to pass a law authorizing counties to raise a tax for building railroads. *Third*—That when properly understood there is no such law, and the power is not conferred upon the county judge to submit the question by the use of the words in the Code " any road."

In the examination of this question I have endeavored to meet and decide all the points fully and fairly. Not having seen the decision of my brother judges, I have labored under much embarrassment in preparing this opinion. I have not been insensible of the weighty consequences suspended upon the decision of this case. I have endeavored in vain to prevent a decision which I believe erroneous and which must sooner or later be so declared. Counties have voted stock for railroad purposes from fifty to four hundred thousand dollars each with indifference as to payment, which to my mind is most alarming. But few of the counties in comparison to the entire number intrusted have as yet voted, and it is but a fair deduction unless this spirit is soon checked, that the state will not be less than ten million of dollars in debt within the next five years for railroad purposes alone. The interest upon this enormous sum, will not be less than seven hundred thousand dollars per annum, all of which must be raised by direct tax upon the people. In these times of feverish excitement, when the public mind is jostled off from its true balance, when public and private economy as well as natural justice are lost sight of in the clamor for public improvements, would it not be well to pause, to refer back to first principles and reflect upon consequences which involve a sacrifice of constitutional rights, loss of private property, and an utter perversion of county and city organization.

*D. S. Wilson* and *J. Burt*, for appellant.

*P. Smith*, for appellee.