STOKES *et al.* v. THE COUNTY OF SCOTT.

1. COUNTY BONDS: RAILROADS. The counties of this State have no power to borrow money, or subscribe stock, to aid in the construction of railroads; and the issuing of bonds by the counties, or the transfer of them by the corporations to whom they are issued, may be restrained by injunction. WOODWARD, J., *dissenting.*
2. SAME. The power and liabilities of counties relating to bonds issued for such purposes, fully considered and discussed; and *The Dubuque and Pacific Rail Road Co.* v. *Dubuque County*, 4 G. Greene 1, overruled; *The State* v. *Bissell*, Ib. 328; *Clapp* v. *The County of Cedar*, 5 Iowa 15; *McMillan et al* v. *Lee County, and Boyles*, County Judge, 3 Ib. 311; and *Ring* v. *The County of Johnson*, 6 Ib. 265, reviewed:

WRIGHT, C. J., holds that the counties have no power to issue bonds for such purposes, and that they are absolutely void, whether in the hands of the county proposing to issue, of the corporation to whom it is proposed to issue them, or of third persons;

STOCKTON, J., concurs in the original proposition, as to the power of the counties, and that the issuing of the bonds, or the transfer of the same by the corporations to whom they are issued, should be enjoined; but holding that bonds in the hands of *bona fide* holders should be treated as valid; and

WOODWARD, J., *dissents* from the judgment of the court, holding that the power of the counties to issue such bonds should be regarded as settled by the above named authorities.

*Appeal from Scott District Court.*

TUESDAY, DECEMBER 13.

ON the 24th of December, 1858, the electors of the county of Scott, by a majority vote, authorized the county judge to subscribe $275,000 to the capital stock of the Davenport and Cedar Valley Railroad Company, and $100,000 to that of the Le Claire and Davenport Railroad Company. By this

vote he was also authorized to levy a tax to pay the principal and interest of the bonds, not to exceed one per cent in each case in any one year.   On the 27th of the same month, these petitioners filed their petition for an injunction to restrain the county judge from subscribing the stock and issuing the bonds.   The injunction was granted, but subsequently, on respondent's motion, was dissolved and the bill dismissed.   Complainants appeal.

·*James Grant* for the appellant, reviewed *Clapp* v. *Cedar County*, 5 Iowa 15; *Ring* v. *Johnson County*, 6 Ib. 265; *McMillan* v. *Lee County, and Boyles, County Judye*, Ib. 304; contending that in those cases the question of the power of a county to issue bonds, was incumbered with the question of vested rights, which does not enter into this case.   He also cited and relied upon the *Commonwealth ex rel. Thomas* v. *The County of Allegheny*, 7 Am. Law Reg. 90; and *McCoy* v. *Washington County*, Ib. 193.

*C. E. Putnam* and *George E. Hubbell* for the appellee.

Have counties in the State of Iowa the constitutional power to subscribe aid for the construction of railroads in the counties?

I.  The constitution neither expressly nor by implication, directly or indirectly, forbids the exercise of this power, and the first clause of section 2, article 1, declares that "all political power is inherent in the people."

II.  There being no constitutional prohibition, the legislature has by law authorized the county judge to submit to the people, at any regular or special election, the question whether money may be borrowed to aid in the construction of any *road* or bridge, Code of 1851, section 114.

III. ˙Is this law constitutional?   The Supreme Court of this State has in the following cases recognized its constitutionality, and the power of the counties to issue bonds to aid in the construction of railroads : *Dubuque and Pacific Railroad Company* v. *Dubuque County*, 4 G. Greene 1;

*The State* v. *Bissell*, Ib. 328 ; *Clapp* v. *Cedar County*, 5 Iowa 15 ; *Ring* v. *Johnson County*, 6 Ib. 265 ; *McMillan et al.* v. *Lee County, and Boyles, County Judge*, Ib. 391.

WRIGHT, C. J.—Several objections are made by the bill, and in the argument in this court, to the proceedings submitting these propositions to the people.   The first in order is that which denies the right or power of the counties in this State to borrow money or subscribe to the stock of any company for the purpose in this vote contemplated.   And this position I proceed to examine.

A brief recapitulation of the cases in which this question has been presented in this State may not be inappropriate. It first arose before our predecessors in *Dubuque County* v. *The Dubuque and Pacific Railroad Company*, 4 G. Greene 1, in which a majority of the court (KINNEY, J., dissenting) affirmed the power of the legislature to authorize such a subscription, and that it had been given by section 114 of the Code.

In a subsequent case, *The State* v. *Bissell*, 4 G. Greene 328, HALL, J., in speaking of this point, says, it "was not urged, and the same question having been decided at the December term, 1853, of this court, [referring to the case *supra*] is not examined.   This decision is not intended to sanction or deny the legal validity of that decision, but to leave the question where that has left it."

The question was first presented to the court as now constituted in *McMillan et al.* v. *Lee County, and Boyles, County Judge*, 3 Iowa 311, but was not then decided, as the case was disposed of upon other and different grounds.

It was first decided by us in *Clapp* v. *The County of Cedar*, 5 Iowa, 15.   In that case, the bonds had been issued and passed into the hands of an innocent holder.   A majority of the court held, under the authority of the previous decisions, that the power could be, and had been, conferred.   It will be seen, however, by reference to page 45 of that case, that the decision was based alone upon the ground that the ma-

jority felt bound by former decisions, and for the reason that it was a subject on which change was disastrous, for says WOODWARD, J., "if we were called upon to decide this question now for the first time, for this State, we should entertain heavy doubts of the existence of the power on any ground ; and if the attempt were made to place it upon section 114 of the Code, under the power to aid in constructing roads, we should think very lightly of the argument. If the power exists, it must have some other foundation. But this is a subject on which change is disastrous," &c.

In *Ring* v. *Johnson County*, 6 Iowa 265, the action was upon the coupons which had passed into the hands of an innocent holder, and the question now under consideration was not argued. The case in 5 Iowa 15 is referred to, however, very briefly, it being stated that "the court has seen no occasion for a change of view."

In the case of *McMillan et al.* v. *Boyles, County Judge,* 6 Iowa 304 and 391, the bonds were issued, tax levied to meet the interest, and the petitioners sought to restrain the county officers from collecting the same. This court had held the vote to be irregular, 3 Iowa 311, and the legislature, by an act of 29th of January, 1857, legalized the issuing of said bonds, and declared said vote to be regular, valid and legal. The power of the county to take stock is recognized by reference to the cases previously adjudicated, and the case turned upon the question of the power of the legislature to *legalize* the *irregularity*, in the manner of submitting the proposition. The power was held to exist, and the order of the court below dissolving the injunction was affirmed.

In the three cases of *Garnes, Alger & Junkin* v. *Robb,* (June term, 1859,) the county treasurer had levied upon personal property to satisfy a tax thus voted. The owners brought trespass and replevin, and among other grounds urged that the county had no power to levy and collect a tax for this purpose. The question was regarded as settled by

the previous cases, and was disposed of by simply referring to them.

In the case before us, the question is made for the first time, to the present members of the court, *before* the bonds have been issued, and before the rights of third parties have intervened.

By reference to the cases cited it will be observed that I have uniformly denied the power, and have held as a consequence that the bonds were invalid, that the tax could not be collected, and that the vote afforded no protection to revenue officers in levying upon proper·y to make the same. My dissent is expressed in *Clapp* v. *The County of Cedar*, *Ring* v.*Johnson County*, *McMillan* v. *Lee County*, *and Boyles*, *County Judge*, and though not expressed in *Garnes et al.* v. *Robb*, it was because the previous decisions were stated without argument, and they showed my position so clearly, that a formal dissent seemed unnecessary. In *McMillan* v. *Boyles*, *County Judge*, I concurred in the opinion that the legislature had the power to legalize the irregularity, but denied the power of the county, though expressly authorized, to subscribe the stock.

These references give us the history of this question in this State, to the present date. As a majority of the court have concluded in this case, where the question is made before the bonds have been issued, that the injunction prayed for should have been made perpetual, I proceed to state briefly the grounds upon which this opinion, so far as I am concerned, is founded.

For myself, as will be seen from what has been stated, I regard that it makes no difference whether the objection is made in a suit on the bonds, or in a proceeding by injunction to restrain the subscription to the stock. In my opinion the county has no power, inherently or otherwise, to issue bonds and subscribe stock for any such purpose, and putting it upon this plain, broad ground, I deny that such bonds are valid, whether held by the railroad company, or by an indorsee. There are, it is claimed, fair arguments and some

authorities for holding that the bonds will not be declared invalid, though the county might and could be restrained by the courts, if applied to, from issuing the same. This view of the case, however, I do not propose to examine, as it will be discussed by my brother STOCKTON, who concurs with me in reversing the case upon the ground that the objection is made before the stock has been subscribed, or the bonds issued.

I deny that under the constitution (old or new) the legislature can confer this power upon the counties. I deny in the second place, that a majority have any inherent right to vote such a tax, so as to subject the property of the minority to seizure and sale for the purpose of paying the same. And in the third place, I affirm, that the legislature never has conferred this power upon the counties.

The argument is not strongly urged, in favor of the inherent right to vote this tax, and I may therefore dispose of it in a few words. Taxation is an element of sovereignty. Safety to the dearest rights of the citizen, demands that this should be so, and that it should not be exercised, except where it is necessary for the welfare or safety of the public. All ordinary taxation, whether national, state or county, is based upon this ground. The citizen pays these taxes in return for the protection and security which is guaranteed and secured to him by law, and the political and municipal organizations created for the like purpose. To support these governments, and those institutions which are essential to their well being and vital to their continuance, he is subject to taxation. For a purpose, such as that embraced in the proposition submitted in this instance, he is not bound. However much such enterprises may tend to develop the material resources of the country, they can in no proper sense be said to render more secure his person, his life or his liberty, nor to place his property under more perfect protection. It is true that intelligence and knowledge may be more generally diffused, as a consequence of the increase of railroad facilities. And the same is true where mills, manufactories and machinery are introduced, and yet it would scarce-

ly be claimed that a county has the inherent right, in its corporate capacity, to tax the people for any such purpose.

The argument that a majority must rule under our form of government, and that each citizen, as a member of society, must submit to this rule, as applied to such questions, is no less dangerous than fallacious. Carried out, popular will when thus exercised, could legalize the execution of the citizen; could take A's property and give it to B. These propositions would be regarded as monstrous. And yet how is it different when the majority attempt to tax the minority without the authority of legislative sanction, for a purpose entirely foreign to the support of government? I see no difference in principle, and there is none certainly when viewed in reference to these fundamental rights which are secured to us by the natural law, and which no legislation can take from us.

Then again, the counties exercise granted powers, and as municipal organizations can not exercise any other. If not expressly granted, yet if necessary to carry out, or accomplish the purpose and object of their creation, they may be exercised, but not otherwise. *McMillan* v. *Lee County*, 3 Iowa 311. If the power claimed in this instance has not been granted, or is not necessary for the fulfillment of the purposes designed in the creation of the corporation, the conclusion follows that its exercise would be illegal and nugatory.

But I pass from this part of the case to the consideration of the first and third propositions before stated. For if the power can, under the constitution, be conferred, and if the legislature has, acting under the constitution, made the grant, then we need not stop to view it as one of inherent right. And here again I may abbreviate this opinion by confining myself to the question, whether the power has been conferred, for if not, the argument is at an end. It is claimed to be given by section 114 of the Code. This view never has been held by any member of this court; and with the utmost respect for the learned judge delivering the opinion in the case

of *Dubuque County* v. *The Dubuque & Pacific Railroad Co.*, 4 Greene 1, where this proposition is maintained, I must say that it is not sustained by the language of the law, and that it is in the very teeth of its spirit, as well as the notorious and well understood history of our legislation on this subject.

The language which it is claimed gives this power, is as follows: "The county judge may submit to the people of his county, at any regular election, or at a special one called for that purpose, the question whether money may be borrowed, to aid in the erection of public buildings; whether the county will construct, or aid to construct, any road or bridge which may call for an extraordinary expenditure; whether stock shall be permitted to run at large, or at what time it shall be prohibited; and the question of any other local or police regulation, not inconsistent with the laws of this State." The question is, what "roads" are meant? Does the section embrace railroads, or only the ordinary highways or roads of the county?

It is said that it is not to be confined to the latter, because these do not require such an extraordinary expenditure. The argument, if true, proves too much. For if *they* did not require it then they are not within the language used, and the provision only applies to railroads, or roads of that character, as contradistinguished from the ordinary highways of the State. And yet no person will claim this. But then why do not our common roads or highways, or why may they not, require such an expenditure, an expenditure greater than can be applied from the ordinary road revenue of the county? Is it improbable that in many portions of the State all of the ordinary revenue applicable to road purposes and all the work provided by law would be insufficient to make some desired and necessary common road passable, or in a proper condition for the trade and travel of the county? It seems to me that it is plain to the apprehension of any person that such a case is not only possible, but probable. I could readily suppose instances, but their probable, not to

say actual exi-tence, must be palpable to any man.   Let me refer to one item in our legislation, however, which affords demonstration on this subject.   We ha l swamp or over- flowed lands in this State before, as well as after, the passage of this section, and before, as well as after, the donation of these lands by Congress to the several states.   Roads had to be constructed over these lands for the purpose of ordi- nary travel, as well as over other portions of the State.   Now if our ordinary highways did not, and do not in fact requii e an extraordinary expenditure under any circumstances, and if the revenue and labor devoted to road purposes are suffi- cient for putting any and all of them in a proper condition, why should the legislature, by express enactment, devote a large portion of the proceeds of these overflowed lands to the opening of the roads over such lands, and at the same time give the roads their equal portion of the ordinary revenue and work?   I repeat, therefore, that this argument proves too much, and is not sustained by the actual position and con- dition of our highways either before, at the time, or subse- quent to the adoption of the Code.

But it is said that the word "any" "extends +o an indefi- nite *number* of roads."   This may be true, and the inquiry would still remain, does it extend to an indefinite number *in kind?*   By no means.   But take the whole language, "any road or bridge *which may call for an extraordinary expendi- ture*," and parsing it, what is its meaning?   Manifestly, the word "any" refers to such as may require the expenditure named, and we still have to ascertain to *what roads* such ex- penditure may be applied.   Not only so, but "any," as here used, refers to *the road—a road,* any instance, case or occa- sion, in any county, in any part of the State, where the ex- penditure is regarded necessary.

But I am told that sections 567–9 of the Code, provide an ample fund for ordinary road purposes, and that this may be increased to any extent by a vote of the people.   In most cases it may be true, that the revenue provided for in these sections is sufficient.   We have already seen, however, that

this is not true to the extent claimed. But it is said that the amount may be increased by a vote of the people. *By what authority and in what manner*, I ask ? *The answer is, by this very section* 114, *which we are now construing.* And thus when it is said that the fund may be increased, by such a vote, what becomes of the argument that such an expenditure was not contemplated as applying to our ordinary highways ?

Having thus noticed, perhaps at greater length than necessary, the arguments urged against the construction for which I contend, I proceed to state the grounds which I think are conclusive in its favor.

And, *first*, the Code itself has given a definition of the word "road" which, in my opinion, places the question beyond controversy. By section ·26, we have a rule for the construction of the statutes of this State, and by the 5th clause it provides that "*the words, highway, and 'road,' include public bridges, and may be held equivalent to the words 'county way,' 'county road,' 'common road,' and 'State road.'*" In the light of this language, what becomes of the argument that the word "road" means *rail road ?* It is a truism, as stated in the case referred to in 4 G. Greene, *supra*, that the great object in the construction of a statute, is to discover the true intention of the legislature, and in giving us the meaning of the word "road," the legislature has given an infallible key to discover the intention in the present instance.

Then again, the same case states that the words of the statute are to have their natural and ordinary sense or meaning. Granted, and what is proved? Just this, that the word "road" according to Webster, applies generally to highways, and as a generic term includes *highway, street and lane.* Not only so, but at the time of the passage of the Code we had not a mile of railroad in the State, and none commenced. Then, again, even now in this State, when we have several lines of railway constructed, no person understands the ordinary meaning of the word to include a railroad. What

charter incorporating a company for the purpose of constructing a railway ever spoke of it as a *road company?* What articles of incorporation ever called or styled the company thus? What act of the legislature giving lands, conferring privileges, or imposing duties upon such a company can be found, which designates it as a *road company?* I answer, none. The truth is, every person, everywhere and under all circumstances, when designing to speak with any degree of accuracy, in this State at least, if they refer to such a *road*, they use the prefix *rail*. In those States where the most usual mode of conveyance and travel is by railway, in ordinary conversation they may be spoken of as roads. But not so even in such States when anything like legal accuracy, or the legal sense, is aimed at. But in this State it is not true that the word *road* is understood *railroad*, either in ordinary conversation, or when used in the statute, for whatever purpose framed. And particularly was this the case at the time of the adoption of the Code.

But this question has a legislative history, and if there was any room for doubt whatever, that history shuts the door effectually.

When the Code was reported to the legislature by the commissioners, section 114 contained the language immediately following the words "any extraordinary expenditure," "*whether the county will subscribe to any work of internal improvement,*" and this clause, after a struggle continuing through several days of the session, was stricken out. And why? Because the power was already given by the use of the previous words "*any road or bridge?*" No one will claim so. Every person looking into the journals of the session, or in the least familiar with the history of that legislature, knows it was because it was expressly intended to withhold the power to subscribe to works of internal improvement.

Again, by reference to the Journal of the House for 1852–3, (the first session after the adoption of the Code,) it will be found that a bill was introduced to amend this section, that

this bill was referred to the judiciary committee with instructions to report what portions of it were then the law of this State, that this committee subsequently reported that all of it was then t! o law except this clause: *"Or whether the county will take stock in any corporation for internal improvement either in or out of the State."* It will also be seen that a substitute was introduced for this bill, which conferred the power in express terms, and that this was once passed, subsequently reconsidered and defeated. I refer for the history of this controversy to the Journal of the House of Representatives, pages 45, 52, 68, 74, 78, 81, 167, 170, 180, 208, 218. So that whether we look to the construction placed upon this section by the Judiciary Committee, or to the subsequent, persistent effort to confer the power, and its defeat by the legislature, there can be no doubt as to the meaning or construction then given and placed upon this section. And thus we find that the same General Assembly which passed the Code, expressly refused to confer the power, and the subsequent one voted down a proposition to amend the section so as to make it read substantially as it did when reported by the commissioners.

In view of this history, I ask, can anything be clearer than that the legislature never intended to confer the power claimed by the appellee in this case? It seems to me not, and that whether we look to the language of the law, the construction given to the words used by the Code itself, to the natural and received sense of the language employed, to the history of its passage, the subsequent attempt to confer the power; or to all of them combined, the argument is abundant, convincing, overwhelming against the position that the power claimed has been conferred.

Such being my construction of the law which it is insisted confers this power, it becomes unnecessary to examine the question of the power of the legislature to authorize taxation by the counties for such purposes.

Nor need I pass upon the other questions made by appellants, in relation to the regularity of the vote in this instance. If there was no power, the strictest compliance with the law as to the manner of submitting the question, cannot avail.

In my opinion, the cause should be reversed, and the injunction made perpetual. And this being the opinion of a majority of the court, it is so ordered.

STOCKTON, J.—I concur in opinion with the Chief Justice that there is no power in the counties of this State, under the provisions of the Code, sections 114, 116, to subscribe to the capital stock of railroad companies, and issue county bonds in payment of the same.

This is the first time, to the court as at present constituted, this question has been made previous to the taking of the stock and the issuing of the bonds. In the case of *Clapp* v. *The County of Cedar*, 5 Iowa 15, it was held by a majority of this court, in which ruling I concurred, that the bonds of Cedar county issued to the "Lyons Central Railroad Company," in payment for stock in said company subscribed by said county, were valid and binding, and the holders thereof were entitled to recover the amount of the bonds from the county.

A decision to the same effect was made in the case of *Ring* v. *Johnson County*, 6 Iowa 265. These are the only cases before this court of actions brought upon the bonds or coupons, in which the validity of such bonds has been questioned; and in each of these cases, in my opinion, the plaintiff was entitled to recover upon grounds entirely distinct from the question of the power in the county to take the stock and issue the bonds.

Independent of the question that the bonds had passed from the possession and ownership of the railroad companies, into the hands of innocent purchasers, who had in good faith paid their money for the same, which money had gone to the use of the counties, and been expended by them, the

General Assembly, by the acts of January 25th, 1855, chapters 128 and 149, in effect legalized these bonds, and made them valid and binding in the hands of the holders thereof. The cases above named, therefore, did not necessarily involve the question of the power of the counties to subscribe the stock and issue the bonds under the sections of the Code above referred to.

In the case of *McMillan* v. *County Judge* and *Treasurer of Lee County*, 6 Iowa 304 and 391, the question was upon the legality of the tax levied to pay the interest on bonds by the county of Lee in payment of its subscription of stock in certain railroads. The vote taken by authority of the county judge, upon the question of taking said stock had been by this court decided to be illegal, null and void. 3 Iowa 311. The General Assembly had, however, by the act of January 29, 1857, (Session acts p. 447,) not only legalized the vote taken by the county judge, but had further declared the bonds issued in pursuance of such vote legal and valid, and a valid lien upon the taxable property of said county, and had required the county judge to levy and collect a tax to meet the payment of the principal and interest of said bonds. Under these circumstances the only question to be determined, was whether the legislature had the power to legalize the vote, and to declare the bonds valid and binding on the county.

As to the power in the legislature there has been at no time any doubt in my mind. I think the power may by them be conferred upon the counties to take the stock and issue the bonds without any constitutional objection; and where it has been conferred, and the bonds have been issued in conformity with it, or where the bonds, though illegally or informally issued, have been subsequently legalized by the legislature, I think they are binding upon the county and must be paid.

In the case at present under consideration, the objection is taken, in the first instance, to the power of the county to issue the bonds. They are not yet issued—they have not

passed into the hands of the railroad company, nor of innocent purchasers for value.

The question is made, in my opinion, at the proper time to test the power of the county to take stock and issue the bonds. It is made at a time when it is unincumberred by any question of *bona fide* holders, or of subsequent legalization of the bonds by the legislature; and looking at the provisions of the Code under which the power is attempted to be derived, and upon which it is placed by the opinion of the court in the case of *Dubuque County* v. *The Dubuque & Pacific Railroad Company*, 4 G. Greene 1, I am clearly of opinion that no such power was intended to be, or has in reality been conferred upon the counties.

The question in this case is to be viewed simply in the light of the power and authority conferred by the legislature, or intended so to be. Such being the case I am constrained to dissent from the ruling of this court in the above entitled case, which in my opinion is the only one in which the question has been authoritatively determined. There is a distinction to be observed between the question of the power of the counties to issue the bonds, when made, as in this case, in the first instance, and before their issue; and when made in a suit brought upon the bonds to recover their amount from the county, by one to whom they have been transferred as an innocent purchaser. The courts, in my opinion, may well allow the question whether the power has been conferred by the legislature upon the counties to issue such bonds, to be made upon an application for an injunction to restrain their issue, when it would not be allowed to be made when the bonds had gone into the hands of an innocent purchaser for value, after the county had received the proceeds of the bonds and after the money had been expended for its use and benefit. The plainest rules of justice and equity would seem to require, when such is the case, that the county should not be allowed to urge, as a defence in an action on the bonds, that they had been issued without the authority of law. To say nothing of public opinion, something is due to good faith, and

to the obligation recognized and resting upon all subordinate authorities, and particularly upon those standing in so close a relation to the supreme authority of the State, as do our county corporations, to maintain the public credit.

In the attitude in which the question now presented stands, I am of opinion that there is no power in the county to issue these bonds, and that the injunction should be made perpetual.

The counsel for appellants refers to the following authorities in support of the position assumed by him.   We have not been able to obtain the volume referred to, but we give the citation for the benefit of those who may be disposed to examine them : 7 Am. Law Reg. 90 and 193; 21 Howard U. S. Rep.

WOODWARD, J., *dissenting.*—As I am unable to concur in the conclusion to which the majority of the court has arrived, that the injunction should have been allowed, it becomes me to state, briefly at least, the ground of my dissent.

In both of the cases, *Clapp* v. *Cedar County*, 5 Iowa 15, and *Ring* v. *Johnson County*, 6 Iowa 265, the question of the power of counties to subscribe to stock in railway companies, and to issue their bonds therefor, was clearly made.   In the first of these cases (page 45,) it is said, in the opinion of the court, that "on the first step in the inquiry, that is, upon the inherent authority of a state to enter into these and similar internal improvements, no one has ventured to make a question.   The second step would be, whether a legislature possesses the power to confer this authority upon a county."   This question is not discussed.   The opinion proceeds : "The next stage is this, do the counties of this State possess this authority, whether inherently, or by express provision?   If we were called upon to decide the question now for the first time, for this State, we should entertain heavy doubts of the existence of the power, upon any grounds, and if the attempt were made to place it upon section 114 of the Code, under the power to aid in constructing roads, we should think very

lightly of the argument.   If the power exists it must have some other foundation.   But this is a subject on which change is disastrous.   It is one on which we are bound by former dicisions.   Such an one has been made, and the public and the world have acted upon it."   "It is impossible to recede.   The world waits and listens for the judicial determination, and then acts accordingly, and in this case has acted with vigor:"   The opinion then refers to the action of the legislature recognizing the exercise of this power by the counties.   In the case against the county of Johnson the court refer to the above, and forbear a discussion of the question.

It would not be possible for a judicial opinion to indicate more clearly what would be the view of the court, if it were untrammeled by previous dicisions and legislative action, and were free to express its own opinion.   So far as regards the existence of the power, true, under the law as it now is, I agree with the Chief Justice and have so agreed from the time the first case was presented.

But the decision of the above cases was placed upon the ground that previous adjudication had declared, and repeated legislation had recognized the existence of the power.   Admitting the truth that courts, as well as individuals, might differ in opinion, we conceive that this was a subject on which the highest detriment might be wrought, both to the people of the State at large, and to the individuals and bodies concerned, by a fluctuation of opinion in the courts ; and regarding the fact that companies and individuals had committed themselves to a very great extent, putting faith in the previous adjudications and legislation, we (the majority of the court,) conceive ourselves bound by as high considerations as can well be addressed to a court, to stand by past decisions.   I feel myself justified by these considerations and still hold to them.

And this is the ground upon which the above decisions are placed, and the only ground.   No argument is drawn from the circumstance that the bonds had been issued, or that they

Stokes et al. v. The County of Scott.

were in the hands of *bona fide* purchasers. No argument, I mean, bearing on the greater question of the power of the county, or of the validity of the bonds. The *bona fides* of the holders title has, it is true, some influence upon the question of what defenses may be made, but this is unimportant in connection with the present considerations.

The opinion of Justice STOCKTON, concurring with the Chief Justice in the position that the counties do not possess the power in question, holds that the issuance of the bonds may be resisted and prohibited when the application therefor is made before they have been uttered. This opinion stands upon the want of authority, in fact, in the county, and still recognizes the former decisions where the bonds had been uttered and were in the hands of innocent holders.

With this opinion I am not able to concur, because, if there is a want of authority I can not distinguish between the cases where the bonds have been, and where they have not been issued. The lack of authority to create them goes to the foundation of any considerations concerning them. If there is no power, the vote and the bonds are equally void, —equally *nullities*. The vote, in such case, has no virtue to support a bond which has gone out to a third person, any more than one which has not yet gone out. If the defect were in some informality, or in some steps of the proceeding to obtain a vote, it may well be regarded as cured when the obligation has been sent out to the world. But a want of power to vote, of authority to make obligation, is incurable; no matter when it is shown, or in whose hands the bond may be. The *bona fides* of a purchase, and the innocency of a holder cannot *create a power*.

In respect to the case of *Lee County*, 6 Iowa 304 and 391, I have at all times regarded it as a case of legalizing the vote against informalities, and not as touching the *fundamental* point of authority. The act there in question (Acts 1857, page 447) uses the terms "all votes in Lee and Davis counties, *in the form of a joint or several proposition, &c.,*" and the county is forbidden to plead that the bonds are

" irregular or invalid in consequence of the *informalities caused by this Act.*' " · And again, the bonds issued were to be held valid, &c., " notwithstanding any *informality or irregularity* in the submission of the question to the vote of the people."

In my opinion in the above case, (6 Iowa 305–30,) I say that " the question now made is, whether the legislature could cure the evils existing in the former submission to any vote by the people of Lee county." The question of power is passed by, and the opinion says : " we understand this question to have been settled in the case of *Clapp* v. *Cedar County.*" Then the opinion proceeds, " the power having been conferred, can the General Assembly cure any *defects in the exercise of it ?*" " If this exercise of authority were held to be *unconstitutional*, then it would follow that the legislature *could not render the case valid.* But inasmuch as that body can confer the authority, and has conferred it, we conceive that the same body may remedy *a defect in the exercise of it.*"

The opinion of the Chief Justice in the same case (6 Iowa 393) views the question in the same light, that is, as one concerning the power of the legislature to *cure a defect, or remedy an irregularity.*

If the fact that the bonds have been issued and sold, and have gone into the hands of innocent purchasers whose money has gone to the county and been expended for its benefit, has weight, and may be urged on the one side ; then it would seem that, on the other, the contrary might be shown, namely, that the money had not been so used, in those cases where the road has not been built. Where it has been so applied, it is true that justice and equity would forbid the county pleading a want of authority ; but this is in the moral sense, and it does not follow that the law will forbid it, for however bad the morals in pleading it, the bonds are nevertheless absolutely void. In conclusion, I am not able to concur in saying, that because the objection is made *in limine,* or before the bonds are issued, therefore there is no authority in

the county to utter them; whilst after they have gone forth, that power exists.  They rest on the same vote in both cases.

The weight of the argument, drawn from former decisions and legislation, presented in the case against Cedar county, has been inconceivably strengthened by that and the subsequent cases, and I regard it as my duty in this, more than any other case that has ever come before me *stare decisis*. Therefor, in my opinion the injuction should be dissolved.